Glenn GALLAS, Terry Mayfield, & Richard McGrew  *v.*
Cecil ALEXANDER, Chairman, Arkansas Racing Commission;
Oaklawn Jockey Club, Inc.;  Arkansas Horsemen Benevolent
& Protective Assoc., Inc.;  & Southland Racing Corp.

06–956                                                    263 S.W.3d 494

Supreme Court of Arkansas
Opinion delivered September 27, 2007

*Martha M. Adcock*; *Cox, Cox & Estes, PPPLC*, by: *S. Lance Cox* and *Lauren E. Pratchard*, for appellants.

*Timothy G. Gauger*, Deputy Att'y Gen., and *Matthew McCoy*, Ass't Att'y Gen., for appellee Cecil Alexander, Chairman, Arkansas Racing Commission.

*Friday, Eldredge & Clark, LLP*, by: *James M. Simpson, Walter M. Ebel, III*, and *Martin A. Kasten*; *Wood, Smith, Schnipper & Clay*, by: *Don M. Schnipper*, for appellee Oaklawn Jockey Club, Inc.

*Gary M. Lax*, for appellee Horsemen's Benevolent and Protective Association, Inc.

*Wright, Lindsey & Jennings, LLP*, by: *Stephen R. Lancaster*; *Rieves, Rubens & Mayton*, by: *Kent J. Rubens*, for appellee Southland Racing Corporation.

PAUL DANIELSON, Justice. Appellants Glenn Gallas, Terry Mayfield, and Richard McGrew appeal from the circuit court's order granting summary judgment to appellees Cecil Alexander, Chairman of the Arkansas Racing Commission (the Commission); Oaklawn Jockey Club, Inc.; and Arkansas Horsemen Benevolent & Protective Association, Inc. (AHBPA) and dismissing appellants' complaint, which alleged that Act 1151 of 2005, permitting the public's authorization of wagering on electronic games of skill

at horse and greyhound racing parks, was unconstitutional.[1] Appellants raise three points on appeal: (1) that the circuit court erred in finding that Act 1151 was not an unlawful delegation of power by the legislature to the racing venues; (2) that the circuit court erred in finding that Act 1151 was not an unlawful delegation of power from the legislature to the Commission; and (3) that the circuit court erred in finding that Act 1151 was not unconstitutional as special or local legislation. We affirm.

On March 22, 2005, Act 1151 of 2005 became law without the signature of then-Governor Mike Huckabee. The Act provided, in part, that:

> cities or counties where horse racing or greyhound racing parks are located in Arkansas should have the opportunity to address these issues and promote economic development, tourism, and agribusiness by allowing the voters in these cities or counties to have the opportunity by local election to authorize horse racing or greyhound racing parks in their communities to offer wagering on additional forms of electronic games of skill.

Act 1151 of 2005, § 1 (now codified at Ark. Code Ann. § 23-113-101(c) (Supp. 2005)). The Act amended Title 23 of the Arkansas Code and established Chapter 113, entitled *Wagering on Electronic Games of Skill Conducted by Horse Racing and Greyhound Racing Franchisees, Subject to Approval at Local Option Election. See* Act 1151 of 2005, § 1. The Act set forth legislative findings explaining the basis for the legislation, *see* Ark. Code Ann. § 23-113-101, and named the legislation the "Local Option Horse Racing and Greyhound Racing Electronic Games of Skill Act." *See* Ark. Code Ann. § 23-113-102 (Supp. 2005).

On December 6, 2005, appellants filed a complaint and petition for declaratory judgment, challenging the legislation.[2] In it, appellants claimed that the Act was invalid in that it unlawfully delegated the legislature's authority to two private entities, namely

---

[1] Southland Racing Corporation intervened in this matter, subsequent to the decision of the circuit court, rendering it too an appellee.

[2] The complaint was initially lodged against the following defendants: Senator Jim Argue, President Pro Tempore of the Senate; Representative Bill Stovall, Speaker of the House; Senator Bob Johnson; Representative Phillip Jackson; Mike Bush, Mayor of Hot Springs; Cecil Alexander, Chairman, Arkansas Racing Commission; and the Garland County Board of Election Commissioners. In a first amended petition, Gallas added

Southland Racing Corporation, a greyhound racetrack in West Memphis, Arkansas, and Oaklawn Jockey Club, a horse racetrack in Hot Springs, Arkansas, to determine whether a county-wide or city-wide election should be held on wagering on electronic games of skill.[3] It further alleged that the Act constituted an unlawful delegation of power to the Commission, in conferring upon the Commission the power to decide what constitutes an electronic game of skill. Finally, the complaint asserted that the legislation constituted special legislation. In a first-amended petition, appellants added additional claims. Specifically, appellants alleged an equal-protection claim, a monopolies claim, and petitioned for a preliminary and permanent injunction.

On February 1, 2006, appellee Oaklawn moved for summary judgment. In its motion, Oaklawn asserted that appellants' claims were fatally flawed and must be dismissed, on the following bases: (1) the plaintiffs were estopped from contesting the constitutionality of Act 1151 because they failed to challenge it by filing suit before the election; (2) Act 1151 was not special or local legislation; (3) Act 1151 did not improperly delegate legislative power; (4) there was no improper monopoly; (5) there was no equal-protection violation; (6) Arkansas Constitutional Amendment 46 permitted such regulation to promote horse racing in Hot Springs; (7) plaintiffs failed to exhaust their administrative remedies; (8) plaintiffs lacked standing; (9) the complaint failed to state facts upon which relief could be granted; (10) plaintiffs failed to follow statutory election-contest procedure; (11) Arkansas law prohibited amending of an election-contest complaint; (12) venue was not proper as to all parties; and (13) the circuit court lacked subject-matter jurisdiction. Appellants responded.

On February 13, 2006, the AHBPA moved to intervene in the matter, and appellants responded in opposition to the motion. On March 6, 2006, the circuit court held a hearing on the motion

Oaklawn Jockey Club, Inc., as a defendant. However, in separate orders by the circuit court, Gallas voluntarily dismissed Mayor Bush, the Garland County Election Commissioners, Senator Argue, Representative Stovall, Senator Johnson, and Representative Jackson. Both the AHBPA and Southland Racing Corporation were subsequently permitted to intervene in the matter by the circuit court.

[3] Both Oaklawn and Southland are considered "franchise holders" under the Act. A "franchise holder" is "any person holding a franchise to conduct horse racing under the Arkansas Horse Racing Law, § 23-110-101 et seq., or greyhound racing under the Arkansas Greyhound Racing Law, § 23-111-101 et seq." Ark. Code Ann. § 23-113-103(6) (Supp. 2005).

to intervene, which the circuit court granted. Then, on March 16, 2006, appellants moved for summary judgment. In the motion, appellants asserted that Act 1151 was unconstitutional for the following reasons: (1) Act 1151 unconstitutionally delegated authority to Oaklawn; (2) Act 1151 unconstitutionally delegated power to the Commission; (3) Act 1151 was special legislation because it arbitrarily disenfranchised the residents of Garland County; (4) Act 1151 was special legislation because it only gave gambling rights to racetracks and, more specifically, to Oaklawn and Southland and no other persons or businesses in the State of Arkansas; (5) Act 1151 violated equal protection of the laws of Arkansas; and (6) Act 1151 created an illegal monopoly. On March 30, 2006, the Commission filed its motion for summary judgment. In addition to the reasons set forth by Oaklawn in its summary-judgment motion, the Commission asserted that the Act was constitutional for two additional reasons: (1) the franchise holder had not been delegated the power to make the law; and (2) the legislature provided sufficient oversight by the Commission and reasonably comprehensive guidance to audit the franchise holder's limited discretionary authority. With respect to determining whether a game constituted an electronic game of skill, the Commission maintained that the Act was constitutional because it conveyed sufficient direction to the Commission when measured by common understanding and practice. Finally, the Commission claimed that the Act did not constitute special legislation, did not violate equal protection, and did not authorize a monopoly because Oaklawn and Southland were not given the exclusive right to conduct wagering on electronic games of skill. On April 6, 2006, the AHBPA moved to adopt and join in the summary-judgment motions filed by Oaklawn and the Commission.

On April 14, 2006, the parties filed a stipulation to undisputed facts, and on April 21, 2006, the circuit court held a hearing on the cross-motions for summary judgment. At the conclusion of the hearing, the circuit court took the matter under advisement. On May 2, 2006, the circuit court filed its memorandum opinion. In it, the circuit court first found that the matter could not be characterized as an election contest, which should have been brought before the election. It then ruled that an exception to the rule of exhausting administrative remedies applied, since there were no disputed facts for the parties to present and the analysis required consisted solely of applying the law to the undisputed facts and rendering a decision. Next, the circuit court dismissed appellants' claims alleging an improper monopoly and an equal-

protection violation, finding that appellants lacked standing to make both challenges. That being said, the circuit court found that appellants did have standing to challenge the constitutionality of the Act as county voters that may have suffered harm by the citywide-only election. With respect to venue, the circuit court found that venue was proper as each of the remaining litigants stipulated to that.

Next, the circuit court found that the General Assembly did not delegate its power to make law, despite the extent to which the statute permitted franchise holders to determine the venue of the election, as it did not allow the franchise holder or the local voters any discretion in determining what the law was or would be with respect to wagering on electronic games of skill. In addition, the circuit court found that the conditions put in place by the General Assembly, which must be complied with *after* the election, demonstrated that the franchise holder did not have sole discretion in picking the forum. As to appellants' allegation that the Act impermissibly delegated legislative authority to the Commission, the circuit court found that making a factual determination as to whether a particular electronic game has an element of skill or not was clearly an administrative-agency function. The circuit court also found that the legislative definition of "electronic games of skill" conveyed sufficient direction to the Commission when making such a determination. Finally, the circuit court concluded that Act 1151 was constitutional because the rational-basis test was satisfied and it further found that the General Assembly's reasoning was rational with respect to why racetracks should be the place where electronic games of skill should be permitted. In conclusion, the circuit court denied the appellants' motion for summary judgment and found that the appellees were entitled to summary judgment. In a judgment filed May 12, 2006, the circuit court incorporated its memorandum opinion and dismissed the appellants' complaint with prejudice. Appellants now appeal.

### Failure to Exhaust Administrative Remedies

As an aside, we first address whether the appellants failed to exhaust their administrative remedies. This issue was not raised by the parties, but was decided by the circuit court, and often poses a concern. That being said, it is of no moment in the instant case. The doctrine of exhaustion of administrative remedies provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has

been exhausted. *See Department of Human Servs. v. Howard*, 367 Ark. 55, 238 S.W.3d 1 (2006). We have repeatedly held that in order to preserve a constitutional argument in an appeal from an agency decision, the constitutional issue must first be raised and developed at the administrative level. *See, e.g., Teston v. Arkansas State Bd. of Chiropractic Exam'rs*, 361 Ark. 300, 206 S.W.3d 796 (2005). Moreover, we recently held that a petitioner was not required to first seek a declaration regarding the constitutionality of an act from an agency, where the petitioner had no action pending before the agency that required her to also raise her constitutional challenge, prior to filing an action for declaratory judgment in the circuit court. *See McGhee v. Arkansas State Bd. of Collection Agencies*, 368 Ark. 60, 243 S.W.3d 278 (2006). Accordingly, the appellants' challenge to the constitutionality of Act 1151 is properly before us.

## I. Unlawful Delegation of Legislative Authority to a Private Entity

For their first point on appeal, appellants argue that the General Assembly unlawfully delegated its legislative authority to a private entity when it allowed Oaklawn and Southland to choose who got to vote in a special election, pursuant to Ark. Code Ann. § 23-113-201(a)(2)(A)(ii) (Supp. 2005). Recognizing that this court has previously held that it was not a delegation of legislative authority to require a vote of the people as a condition to implementation of a law, appellants urge that the instant case differs in that, here, the franchise holders, who have a pecuniary interest in the outcome of the election, are permitted to choose whether the election on wagering on electronic games of skill will be submitted to just the city or to the entire county.

Appellee the Commission responds that the franchise holder's determination of election forums is constitutional for two reasons: (1) the franchise holder has not been delegated the power to make the law; and (2) the legislature provided sufficient oversight by the Commission and reasonably comprehensive guidance to audit the franchise holder's limited discretionary authority. Specifically, the Commission notes that the Act does not provide local voters or franchise holders any discretion to determine what the law is regarding wagering on electronic games of skill. In addition, the Commission maintains, Act 1151 does not evoke any "self-interest" concerns because franchise holders under Act 1151 are narrowly regulated to only one of two possible options for a local referendum — the county or the city.

Appellee Oaklawn avers that Act 1151 does not improperly delegate lawmaking power to racing franchise holders because the General Assembly itself conditioned wagering on electronic games of skill upon the franchise holder demonstrating local support for the games by a positive vote in either the city or the county. It asserts that the General Assembly's decision to require some local support for electronic games of skill by either city or county voters is not irrational. Finally, Oaklawn contends, the case relied upon by the appellants, *Leathers v. Gulf Rice Arkansas, Inc.*, 338 Ark. 425, 994 S.W.2d 481 (1999), is irrelevant to the appeal at hand.

Appellee Southland urges that it is not the franchise holder's decision as to whether wagering on electronic games of skill will be conducted, but instead, that decision rests with the voters. It asserts that the General Assembly exercised its power by declaring that a condition to allowing wagering on electronic games of skill was ascertaining the will of the majority in either the city or the county.

Appellee AHBPA responds that Act 1151 includes a complete plan of what will occur after a referendum on wagering on electronic games of skill, leaving no room for any of the appellees to "legislate." It urges that the Act simply allows a vote on the matter by the people, *i.e.*, a condition upon which the law will become operative.

The law is well settled that summary judgment is to be granted by a trial court only when it is clear that there are no genuine issues of material fact to be litigated, and the party is entitled to judgment as a matter of law. *See City of Farmington v. Smith*, 366 Ark. 473, 237 S.W.3d 1 (2006). Once the moving party has established a prima facie entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *See id.* On appellate review, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. *See id.* We view the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *See id.* Our review focuses not only on the pleadings, but also on the affidavits and other documents filed by the parties. *See id.*

In this case, we first must consider whether Act 1151 unconstitutionally delegates legislative authority to franchise holders, currently Oaklawn and Southland, when it permits the fran-

chise holder, whose park is located within the city limits, to elect whether the election on wagering on electronic games of skill shall be submitted to either the city, the town, or the county. At issue is Ark. Code Ann. § 23-113-201(a)(2) (Supp. 2005), which provides:

(2)(A)(i) The franchise holder may not conduct wagering on electronic games of skill under this chapter unless the question of the wagering on electronic games of skill under this chapter has been submitted to the electors of the city, town, or county in which the franchise holder's racetrack park site is located and where the wagering on electronic games of skill is to be conducted, at any special or general election, and a majority of the electors voting on the question have approved at the election wagering on electronic games of skill under this chapter.

(ii) *If the racetrack park is located within the corporate limits of a city or town, the question shall be submitted to the electors of either the city, town, or county in which the racetrack park is located, as requested by the franchise holder,* and if the racetrack park is not located within the corporate limits of a city or town, then the question shall be submitted to the electors of the county in which the racetrack park is located.

(B)(i) The governing body of the city, town, or county, as the case may be, shall by ordinance submit the question to the electors if requested by the franchise holder.

(ii) If the franchise holder makes a request for an election, the franchise holder shall present to the governing body evidence of anticipated benefits to economic development, job creation, tourism, and agribusiness which may result, directly or indirectly, from the authorization of wagering on electronic games of skill at the franchise holder's racetrack park site under this chapter, if approved by the local voters at the election.

(iii) The franchise holder may make requests on one (1) or more occasions, and elections so requested from time to time by the franchise holder may be held during any one (1) or more calendar years as requested from time to time by the franchise holder, but not more than one (1) special election shall be held for such purposes by the same city, town, or county during any particular calendar year.

(iv) The cost incurred by the city, town, or county involved in conducting each special election pursuant to the franchise holder's

request shall be paid by the franchise holder. The election shall be held and conducted under the general election laws of the state, except as otherwise provided in this section.

Ark. Code Ann. § 23-113-201(a)(2)(A) (Supp. 2005) (emphasis added). We must observe that Arkansas statutes are presumed to be constitutional, and the burden is placed on the party attacking the statute. *See Boyd v. Weiss*, 333 Ark. 684, 971 S.W.2d 237 (1998). Thus, it was incumbent on the appellants to prove that Act 1151 amounted to an improper delegation of legislative power.

We have previously held that where the General Assembly decided to allow the voters a voice on the question of Hot Springs Sunday racing, it did not constitute a delegation of legislative authority to enact a law. *See Swanberg v. Tart*, 300 Ark. 304, 778 S.W.2d 931 (1989). In *Swanberg*, we recognized that on prior occasions, we had held that the General Assembly can enact a law and provide for operation under it to depend upon a contingency or condition, such as a favorable vote of the electors. *See id.*

Indeed, in *Capps v. Judsonia & Steprock Road Improvement District*, 154 Ark. 46, 242 S.W. 72 (1922), we observed:

> The true distinction is between the delegation of power to make the law, which necessarily involves the discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done. To the latter no valid objection can be made.

154 Ark. at 52, 242 S.W. at 74 (quoting *The Cincinnati, Wilmington & Zanesville, R.R. Co. v. Commissioners of Clinton County*, 1 Ohio St. 77, 88-89 (1852)). In addition, we note that McQuillin's treatise on municipal corporations provides further guidance on the issue:

> Generally a provision in a statute or in a municipal charter that it shall not take effect unless it is assented to by a majority or fixed percentage of the inhabitants of the municipality is not invalid as a delegation of legislative power, provided the statute is complete in itself.

Eugene McQuillin, *The Law of Municipal Corporations* § 4.10 (3d ed. 2007) (footnote omitted).

In the instant case, the circuit court found, in pertinent part:

> When one considers this Act as a whole, consistent with well established rules of statutory construction, it is reasonable to conclude that it sets out a well defined substantive law. The statute clearly allows a franchise holder the right to trigger the election and to some extent determine its venue, but it does not allow such holder or the local voters any discretion in determining what the law is or will be with respect to wagering on electronic games of skill. Under those circumstances it does not violate the "unlawful delegation" doctrine. . . .

We agree and cannot say that Act 1151 constitutes an impermissible delegation of legislative authority on this basis. First and foremost, this case differs significantly from *Leathers v. Gulf Rice Arkansas, Inc., supra*, as relied upon by the appellants. In *Leathers*, the appellees theorized that because Act 344 of 1995 empowered rice producers with the sole discretion of levying an assessment against rice buyers, without giving the buyers a vote, hearing, or review on the assessment, it constituted an unlawful delegation of legislative authority. We agreed, holding that Act 344 failed to afford the rice buyers any notice, hearing, or review before the assessment was imposed on them. Moreover, we found that the unlawful empowerment given to private rice producers was especially offensive when it affected other private persons, such as rice buyers, who had interests opposing or adverse to those of the producers. That is not the situation before us.

Here, it was stipulated by the parties that Oaklawn was a racing park "located within the corporate city limits of Hot Springs, Arkansas." Thus, pursuant to the statute, the question on wagering on electronic games of skill was to be submitted to the electors of either the city, town, or county in which the racetrack was located, as requested by Oaklawn. *See* Ark. Code Ann. § 23-113-201(a)(2)(A)(ii). Based on the language of the statute, it is clear that the General Assembly contemplated that the city, town, and county in which the racetrack was located would have similar interests in voting to approve or reject wagering on electronic games of skill in its respective area. Thus, irrespective of which electorate the franchise holder requests, the citizenry of the area and its opinions will be well-represented. Moreover, there is a vote by the citizenry — something that was not present in *Leathers*. While a private entity is involved in the process of submitting the matter to a vote of the people, the franchise holder

is not imposing any burden on the people without notice. For these reasons, we find *Leathers* to be inapposite.

▌ In addition, neither Oaklawn nor Southland has been vested with lawmaking authority by the General Assembly's actions. Instead, the franchise holder must merely comply with the law established by the General Assembly, which requires that the question of wagering on electronic games of skill be put to a vote of the people, be it city, town, or county. More importantly, we should note, there are no guarantees when a matter is brought before the people; here, the franchise holder is responsible for the cost of the election, no matter what the outcome.[4] *See* Ark. Code Ann. § 23-113-201(a)(2)(B)(iv). Thus, we cannot say that it is unreasonable that the franchise holder should be able to choose which electorate shall vote on the measure. And again, a vote of the people is a vote of the people — the public interest is the same, no matter whether it is the city voting or the county. We find no basis on which to hold that the Act constitutes an unlawful or unreasonable delegation of legislative authority to the racing park franchise holders and, for that reason, we affirm the circuit court on this point.

## II. *Unlawful Delegation of Legislative Authority to the Commission*

Appellants next argue that the General Assembly unlawfully delegated its legislative authority to the Commission when it directed the Commission, in Ark. Code Ann. § 23-113-201(f)(2)(A)(i) to make a finding as to whether a game and electronic device or machine constitutes an electronic game of skill. Specifically, the appellants urge that the General Assembly did not provide sufficient standards to determine what games should or will be approved by the Commission. They contend that the legislature should have provided a more complete plan and instructions as to what games were permissible and that, in failing to do so, the legislature has made the Commission a lawmaker.

---

[4] With respect to appellants' argument that the franchise holders have a pecuniary, self-serving interest in the outcome of the election, that may be true; the franchise holder must hold hope that the matter will pass. However, as we have already observed, there are no guarantees in elections. No evidence has been presented that the matter would have failed had it been put to the electors of Garland County. Certainly, the appellants do not expect that the franchise holder can see into the future.

Appellee the Commission responds that the definition of "electronic games of skill" is constitutional because it conveys sufficient direction to the Commission when measured by common understanding and practice. The Commission additionally urges that the appellants do not have standing to raise this constitutional challenge because they have not made a showing of injury or prejudicial impact.

Appellee Oaklawn responds that Act 1151 sufficiently defines the role of the Commission, which is to regulate, not legislate. It submits that nothing in Act 1151 provides the Commission with the authority to make the law. Further, it suggests that administrative agencies routinely make factual determinations that do not constitute improper making of law and that making an initial regulatory determination on whether an electronic game is a permissible game of skill as defined by the Act is purely an administrative function. Finally, Oaklawn avers that the General Assembly has given sufficient guidance by stating that the games must afford an opportunity for the exercise of skill or judgment where outcomes are not completely controlled by chance alone. Appellees Southland and AHBPA respond that Act 1151 merely delegates the responsibility for determining facts about proposed electronic games of skill to the Commission.

Before reaching the merits of this argument, we must first address the appellees' allegation that the appellants lack standing to bring the instant challenge. With respect to standing, we have said:

> In numerous cases, we have held that a litigant has standing to challenge the constitutionality of a statute if the law is unconstitutional as applied to that particular litigant. *Morrison v. Jennings*, 328 Ark. 278, 943 S.W.2d 559 (1997); *Hamilton v. Hamilton*, 317 Ark. 572, 879 S.W.2d 416 (1994); *Medlock v. Fort Smith Serv. Fin. Corp.*, 304 Ark. 652, 803 S.W.2d 930 (1991). The general rule is that one must have suffered injury or belong to a class that is prejudiced in order to have standing to challenge the validity of a law. *Morrison, supra; Medlock, supra*. Stated differently, plaintiffs must show that the questioned act has a prejudicial impact on them. *Tauber v. State*, 324 Ark. 47, 919 S.W.2d 196 (1996); *Garrigus v. State*, 321 Ark. 222, 901 S.W.2d 12 (1995).

*Arkansas Tobacco Control Bd. v. Sitton*, 357 Ark. 357, 363, 166 S.W.3d 550, 554 (2004) (quoting *Ghegan v. Weiss*, 338 Ark. 9, 14-15, 991 S.W.2d 536, 539 (1999)). Here, the circuit court specifically found that the appellants had standing to challenge the Act:

Plaintiffs allege that Act 1151 stripped them of their right to vote through special or local legislation and improper delegation of legislative power. Since they are residents of Garland County and could have voted in a countywide election, they may have suffered harm if their constitutional argument on those issues is correct. On those points, the Court finds that they have standing to challenge the Act.

A review of the record reveals no notice of cross-appeal by the appellees. Thus, this finding was not challenged by them on appeal and is not preserved for our review. *See, e.g., Lawson v. City of Mammoth Spring*, 287 Ark. 12, 696 S.W.2d 712 (1985) (wherein the appellee challenged, on cross-appeal, the circuit court's finding of appellant's standing).

That being said, it is true that had Oaklawn elected to present the question of wagering on electronic games of skill to the county, appellants would have been permitted to vote in the election, as they were found to be residents of Garland County by the circuit court. Thus, because the appellants may have been prejudiced by their inability to vote when the issue was presented to the city alone, we hold that they do have standing in the instant case.

With respect to the appellants' argument on appeal, we find it without merit. With respect to this argument, the circuit court found:

> The General Assembly has the power to legalize electronic gambling so long as the games do not constitute lotteries. And making a factual determination as to whether a particular electronic game has an element of skill or not is clearly an administrative agency function. This Court is convinced that the legislative definition of "electronic games of skill" conveys sufficient direction to the Commission as to how it should proceed when measured by common understanding and practice. In addition, the legislature has provided the Commission with sufficient oversight powers and reasonably comprehensive guidance to audit Oaklawn's limited discretionary authority.

We agree with the circuit court. Indeed, Ark. Code Ann. § 23-113-201(f)(2)(A)(i) clearly requires the Commission to determine whether a game constitutes an electronic game of skill:

> (f)(2)(A) Within sixty (60) calendar days after the submission of the information required by subdivision (f)(1) of this section, the commission shall make a finding as to whether:

(i) The game and electronic device or machine constitutes an electronic game of skill authorized by this chapter[.]

Ark. Code Ann. § 23-113-201(f)(2)(A)(i). However, contrary to what the appellants claim, the General Assembly provided, what we consider to be, very clear guidelines for determining whether a game or device constitutes an electronic game of skill. First and foremost, the General Assembly defined the term "electronic game of skill:"

> (5)(A) "Electronic games of skill" means games played through any electronic device or machine that afford an opportunity for the exercise of skill or judgment when the outcome is not completely controlled by chance alone.
>
> (B) "Electronic games of skill" does not include pari-mutuel wagering on horse racing and greyhound racing governed by the Arkansas Horse Racing Law, § 23-110-101 et seq., or the Arkansas Greyhound Racing Law, § 23-111-101 et seq., whether pari-mutuel wagering on live racing, simulcast racing, or races conducted in the past and rebroadcast by electronic means[.]

Ark. Code Ann. § 23-113-103(5) (Supp. 2005). In addition, it specifically set forth what it considered to be a guideline in determining whether a game is "not completely controlled by chance alone:"

> (d)(1) In order to constitute an electronic game of skill under this chapter, the game must not be completely controlled by chance alone.
>
> (2) A game is not completely controlled by chance alone if the betting public may attain through the exercise of skill or judgment a better measure of success in playing the game than could be mathematically expected on the basis of pure luck, that is, on the basis of pure random chance alone.

Ark. Code Ann. § 23-113-201(d) (Supp. 2005).

■ Appellants cite to our decision in *Leathers v. Gulf Rice Arkansas, Inc., supra*, wherein we quoted the United States Supreme Court, for the following proposition when determining whether a delegation is constitutional:

> [E]ach enactment must be considered to determine whether it states the purpose which the Congress seeks to accomplish and the

standards by which that purpose is to be worked out with sufficient exactness to enable those affected to understand these limits. Within these tests the Congress needs specify only so far as is reasonably practicable.

338 Ark. at 429, 994 S.W.2d at 483 (quoting *United States v. Rock Royal Co-Operative, Inc.*, 307 U.S. 533, 574 (1939)). Reviewing the guidelines set forth by the General Assembly, we cannot say that the standards were not set out with sufficient exactness. In addition, we have recognized that the duty of an administrative agency is to hear evidence, decide the credibility of witnesses, and make findings of fact. *See Cain v. Arkansas State Podiatry Examining Bd.*, 275 Ark. 100, 628 S.W.2d 295 (1982). Our review reveals that the Commission will be able to fulfill its duty using the guidelines and standards set forth by the General Assembly. Furthermore, the appellants have not provided or suggested what they might consider more exacting guidelines or standards. Accordingly, we affirm the circuit court on this point.

### III. Special or Local Legislation

For their final point on appeal, appellants argue that Act 1151 of 2005 is special legislation because it arbitrarily allows franchise holders Oaklawn and Southland to operate electronic gambling machines on their properties while making it a criminal offense for all other persons in the state to operate the same. They allege that there is no rational basis for limiting wagering on electronic games of skill to a horse or greyhound racetrack and that Amendment 46 to the Arkansas Constitution is inapplicable and does not provides such a basis. Finally, the appellants contend that the practical operation of the Act makes it local or special legislation.

Appellee the Commission responds that the Act does not constitute special legislation or local legislation because any franchise holder following the legislature's complete plan may conduct wagering on electronic games of skill. It further reasserts that the appellants lack standing to raise this argument because they have not suffered any injury, nor do they belong to a class that was prejudiced.

Appellee Oaklawn responds that Act 1151 is not special or local legislation as it contains provisions that are not presently applicable to any current franchise holder, but could be applied to

future franchise holders.[5] It further points out that other entities and localities can qualify under the requirements of the statute because it is open-ended. In short, it contends, based on the statutory framework in place, nothing in the Act limits its application to any particular franchise holder or to any particular county or locality.[6]

Appellee Southland responds that Act 1151's legislative findings provide numerous legislative facts and conclusions, which make the Act a piece of rational legislation. It further submits that the Act does not limit wagering on electronic games of skill to Oaklawn and Southland, as any franchise holder can operate such electronic gaming; thus, should an entity other than those two wish to operate such games, it simply must comply with the statutes for obtaining a franchise.

Appellee AHBPA responds that the legislative findings set forth by the General Assembly provide the rational basis for Act 1151. In addition, it maintains that the Act is not local legislation in that it clearly has statewide application because other Arkansas statutory authority does not limit horse racing and greyhound racing to Hot Springs and West Memphis, Arkansas. Finally, AHBPA contends that the appellants have not met their burden of proving the unconstitutionality of Act 1151.

State statutes are presumed to be constitutional, and the party attacking the statute has the burden of showing that the challenged statute is clearly unconstitutional. *See Weiss v. Geisbauer,* 363 Ark. 508, 215 S.W.3d 628 (2005). The Fourteenth Amendment to the Arkansas Constitution provides that "[t]he General Assembly shall not pass any local or special act." Ark. Const.

---

[5] Specifically, Oaklawn points out that the Act provides for the situation in which a racetrack is located in the county, when neither of the current racetracks are so located.

[6] In addition, Oaklawn contends that the appellants are estopped from challenging the procedures under Act 1151 because they had ample opportunity to challenge the Act prior to the election, but did not. The circuit court found that the appellants were not challenging the election process and that the appellants recognized that if the Act was constitutional, the election was valid in all respects. Thus, the circuit court held, the lawsuit could not be characterized as an election contest which should have been brought before the election.

As was the case with standing, the appellees did not file a notice of cross-appeal, seeking to challenge this finding by the circuit court. Accordingly, we are precluded from reviewing the argument on appeal. Nonetheless, we cannot say that the circuit court erred. Appellants challenged the constitutionality of the statute, not the election process. Therefore, appellees' estoppel argument would be without merit.

amend. 14. We have defined local legislation as legislation that is arbitrarily applied to only one geographic area of the state, while special legislation arbitrarily separates from the operation of an act some person, place, or thing from another. *See Hall v. Tucker*, 336 Ark. 112, 983 S.W.2d 432 (1999).

In addition, the fact that a statute ultimately affects less than all of the state's territory does not per se render it local or special legislation. *See id.* We have consistently held that a statute that applies to only one area of the state is constitutional if the reason for limiting the statute to one area is rationally related to the purposes of that statute. *See id.* What we review is whether the decision to apply the act to only one area of the state is rational. *See id.* The rational-basis standard presumes the rationality of the statute, which when applied to social and economic legislation can only be overcome by a clear showing of arbitrariness. *See id.* We may also go beyond the legislation and take judicial notice of facts relevant to whether the act's operation and effect are local. *See id.*

With respect to local or special legislation, the circuit court made the following findings:

> In the case at bar, the purpose of Act 1151 is to promote live racing and the associated agribusiness, tourism and related economic activity including job creation and economic development, and to stop the flow of money out of state which might otherwise be spent in Arkansas. In addition residents of the entire state, including plaintiffs, can benefit from the tax generated from the authorized games. In the Court's judgment, the General Assembly has devised a comprehensive plan that reasonably addresses these goals in a rational manner.
>
> . . . .
>
> Oaklawn became a racetrack franchise holder in Arkansas many years ago and presently has the only sanctioned horse racetrack in the state. But under existing horse racing law, future racing franchises can be awarded in any and all of the remaining 74 counties to anyone who jumps through the same hoops Oaklawn jumped through to obtain its franchise. See *Ark. Code Ann.*, Sec. 23-110-301 *et seq.* Upon becoming a franchise holder, the recipient can conduct electronic games of skill if the necessary conditions set out in Act 1151 are met.
>
> A license is required for individuals to engage in many professions and/or business activity in this state, otherwise they run afoul

of the law. Notably, it is illegal for a person to engage in the practice of law or medicine without a license. One cannot operate a nuclear power plant, a hospital or pharmacy without appropriate authorization. So the mere fact that gambling can only be conducted by licensed establishments does not create a constitutional problem. Act 1151 is constitutional because the rational basis test is sufficiently satisfied.

. . . .

The General Assembly set out numerous pages of reasoning why racetracks should be the place where electronic games of skill should be allowed. That reasoning is rational and should not be disturbed.

Again, we agree with the circuit court. Our review of the Act reveals that the General Assembly clearly and specifically set forth its findings and purpose for the Act. Section 23-113-101 (Supp. 2005) provides:

(a) It is found and determined by the General Assembly that:

(1) Horse racing and greyhound racing parks in the State of Arkansas promote economic and agribusiness activity in the state and especially in the local communities where the horse racing and greyhound racing parks are located;

(2) Arkansas horse racing and greyhound racing parks also often promote tourism and positive publicity for the state, including recent national publicity surrounding the racehorse "Smarty Jones," the winner of the 2004 Arkansas Derby and the 2004 Kentucky Derby, that went on to be honored as the 2004 best three-year-old thoroughbred horse in the country;

(3) Many states, including Louisiana and Oklahoma, have authorized racetracks to offer wagering on additional forms of electronic games. The State of Texas is considering doing the same;

(4) Many Arkansans travel to adjoining states in order to wager at legal gambling establishments in those states. This adversely impacts Arkansas tourism and results in certain economic activity leaving Arkansas for the benefit of adjoining states;

(5) Economic and agribusiness benefits derived by the State of Arkansas from horse racing and greyhound racing parks in Arkansas,

including Arkansas farms and breeding operations, are and will continue to be adversely impacted by these developments in adjoining and other states;

(6) Although Arkansas horse racing and greyhound racing parks presently are allowed to offer wagering on electronic games based on previously run horse and greyhound races, racetracks in adjoining and other states are allowed to offer more types of electronic wagering games; and

(7) These developments place Arkansas horse racing and greyhound racing parks at a competitive disadvantage to their counterparts in other states and especially affect the economies of the local Arkansas communities and related agribusinesses where the horse racing and greyhound racing parks are located in Arkansas.

(b) It is further found and determined by the General Assembly that:

(1) If no effort is made to address these issues:

(A) Arkansans will continue to spend money out of state which might otherwise be spent in Arkansas;

(B) Arkansas horse racing and greyhound racing parks will remain at a competitive disadvantage to their out-of-state counterparts, and this will not only adversely impact horse racing and greyhound racing parks in Arkansas, but also related Arkansas agribusinesses, including farms and breeding operations, and other Arkansas businesses that realize economic benefits from horse racing and greyhound racing activities in Arkansas; and

(C) Jobs at Arkansas horse racing and greyhound racing parks and at related Arkansas agribusinesses, including farms and breeding operations, along with jobs at other Arkansas businesses that realize economic benefits from horse racing and greyhound racing activities in Arkansas, may become in jeopardy; and

(2) If this chapter is enacted and becomes law and local voters in the communities where the horse racing and greyhound racing parks are located approve the wagering on additional games of skill at Arkansas horse racing and greyhound racing parks as provided in this chapter:

(A) Arkansans will spend money in Arkansas which might otherwise have been spent out of state;

(B) Arkansas horse racing and greyhound racing parks will become more competitive, and this will provide economic benefits to related Arkansas agribusinesses, including farms and breeding operations, as well as other related Arkansas businesses; and

(C) Jobs at Arkansas horse racing and greyhound racing parks and at related agribusinesses, along with jobs at other businesses that realize economic benefits from horse racing and greyhound racing activities in Arkansas, will be better protected and more secure, and additional job opportunities may be created.

(c) For the reasons stated in subsections (a) and (b) of this section and other reasons, the General Assembly finds that cities or counties where horse racing or greyhound racing parks are located in Arkansas should have the opportunity to address these issues and promote economic development, tourism, and agribusiness by allowing the voters in those cities or counties to have the opportunity by local election to authorize horse racing or greyhound racing parks in their communities to offer wagering on additional forms of electronic games of skill.

Ark. Code Ann. § 23-113-101 (Supp. 2005). It is evident to us that the General Assembly's clear intent in enacting the Act was to protect Arkansas's economic and agribusiness activity in the state and in the communities in which horse and greyhound racing parks are located. In addition, the General Assembly specifically cited to the racing parks' competition in other states, which have permitted the same types of establishments to offer more types of electronic gaming, thereby placing Arkansas's tracks at a competitive disadvantage.

▮ We hold that there was nothing irrational or arbitrary about the legislature's decision to authorize wagering on electronic games of skill at the state's establishments, which were already engaged in pari-mutuel wagering, which were subject to a competitive disadvantage by their counterparts in other states, and, most importantly, which are considered to be vital to the state and local economies. Moreover, the legislature's application of the Act is not expressly limited to Oaklawn and Southland; instead, it permits any "franchise holder" to conduct wagering on electronic games of skill, so long as there is compliance with the statutory

scheme. While at the current time Oaklawn and Southland are the only two franchise holders in the state, we observe no limitation which would prohibit another business entity from becoming a franchise holder similar to Oaklawn and Southland, thereby entitling the entity to the same rights provided for under the Act, assuming that the local electorate voted in favor of such.

In the instant case, Act 1151 is not only presumed rational, it is rational, pursuant to our review. Nor do we find that the appellants have met their burden in showing that the Act is clearly unconstitutional. For these reasons, we affirm the circuit court's order on this point.

Affirmed.

Special Justice JIM JACKSON joins.

Special Justice C.C. "CLIFF" GIBSON, III dissents.

BROWN and IMBER, JJ., not participating.

C.C. "CLIFF" GIBSON, III, Special Justice, dissenting. I am in agreement with the majority decision to the effect that 2005 Ark. Acts No. 1151 does not constitute a constitutionally impermissible delegation of legislative authority to "make law," but would note that Act 1151's granting of the power to call and at the same time determine the boundaries of the venue for a local option election to a private for-profit concern, and no one else, is troubling[1] as observed by the Arkansas Attorney General in his review of Act 1151. "Identifying the local electorate would seem to be a matter for the legislature, given that authority to conduct the additional wagering is contingent upon this vote." Op. Att'y Gen. # 2005-093.

I respectfully dissent from that part of the majority opinion that upholds Act 1151 in the face of our Constitution's prohibition against local and special legislation. Ark. Const. amend. 14, provides: "The General Assembly shall not pass any local or special act."

This straightforward blanket prohibition on local and special acts was recently employed by this court to invalidate another enactment of the legislature in *Wilson v. Weiss*, 368 Ark. 300, 245

---

[1] Arkansans are generally accustomed to local option elections being called by proper petitions signed by a significant percentage of registered voters, *see, e.g.*, Ark. Code Ann. § 3-8-502, or at the instance of the local governing body, *see, e.g.*, Ark. Code Ann. § 26-73-111; *see also* Ark. Const. amend. 7 (Initiatives and Referendums).

S.W.3d 144 (2006). The *Weiss* court reviewed the previous applications of amendment 14 to a piece of legislation in some detail as follows:

> We have "differentiated that 'special' legislation arbitrarily separates some person, place, or thing, while 'local' legislation arbitrarily applies to one geographic division of the state to the exclusion of the rest of the state." *McCutchen v. Huckabee*, 328 Ark. 202, 208, 943 S.W.2d 225, 227 (citing *Fayetteville Sch. Dist. No. 1 v. Arkansas State Bd. of Educ.*, 313 Ark. 1, 852 S.W.2d 122 (1993)).

With regard to a challenge under Amendment 14, this court has also said:

> [T]his court has repeatedly held that merely because a statute ultimately affects less than all of the state's territory does not necessarily render it local or special legislation. *Fayetteville, supra*; *City of Little Rock v. Waters*, 303 Ark. 363, 797 S.W.2d 426 (1990). Instead, we have consistently held that an act of the General Assembly that applies to only a portion of this state is constitutional if the reason for limiting the act to one area is rationally related to the purposes of that act. *Fayetteville, supra*; *Owen, supra*; *Board of Trustees v. City of Little Rock*, 295 Ark. 585, 750 S.W.2d 950 (1988); *Streight v. Ragland*, 280 Ark. 206, 655 S.W.2d 459 (1983). Of particular interest, is *Phillips v. Giddings*, 278 Ark. 368, 646 S.W.2d 1 (1983), where we clarified that although there may be a legitimate purpose for passing the act, it is the classification, or the decision to apply that act to only one area of the state, that must be rational.

*McCutchen*, 328 Ark. at 208-09, 943 S.W.2d at 227-28.

In *McCutchen, supra*, we further said that when making a decision as to whether there is a rational reason for applying an act to only one county in this state, "this court may look outside the act and consider any fact of which judicial notice may be taken to determine if the operation and effect of the law is local, regardless of its form." 328 Ark. at 209, 943 S.W.2d at 228. We noted in that case that the purpose of Act 739 of 1995 was to provide funds for the construction of a multipurpose civic center (Alltel Arena in North Little Rock) that would increase tourism, recreation, and economic development throughout the state. We further recognized that in order to achieve those purposes, Pulaski County could well have

been selected as the regional location for the center because of judicially noticed facts, such as the fact that Pulaski County is the most populous county in the state, because it is centrally located, and because it is the seat of state government. This court found that these reasons were not arbitrary or capricious. Because we acknowledged that it is not this court's role to second-guess the legislature, we concluded that the decision to construct the civic center in Pulaski County was rationally related to the intended purposes of Act 739 of 1995.

*Weiss*, 368 Ark. at 307-08, 245 S.W.3d at 150-51. Also of considerable importance to the *Weiss* Court was the history of and reasons for the adoption of Amendment 14 which it reviewed as follows:

[O]ne commentator on Amendment 14's history has said that prior to the overwhelming approval of Amendment 14 by the people of Arkansas in 1926, our State had employed piecemeal limitations through the legislature on local and special legislation, which, over time, "proved inadequate to slow the pace of special and local legislation." Robert M. Anderson, *Special and Local Acts in Arkansas*, 3 Ark. L. Rev. 113, 114 (1949). In fact, editorials and articles published about the time of the passage of Amendment 14 showed that "proponents of the Amendment were chiefly concerned with the rapid growth of special and local legislation and the diminishing amount of time devoted to the consideration of general laws." *Id.* at 114 n.6, 943 S.W.2d 225. Initially, the enforcement of pre-Amendment 14 limitations on the passage of special and local acts was left largely to the legislature, which led to statements like that of Chief Justice Hart of the Arkansas Supreme Court, who said, "[i]f the judgment of the Legislature must control in all cases, the amendment (Amendment 14) could serve no purpose, and the people might just as well not have initiated and adopted it." *Id.* at 115, 943 S.W.2d 225 (quoting *Simpson v. Matthews*, 184 Ark. 213, 216, 40 S.W.2d 991, 992 (1931). Certainly, our case law supports that conclusion. *See, e.g.*, *Weiss v. Geisbauer*, 363 Ark. 508, 215 S.W.3d 628 (2005) (no rational basis existed for giving only Mississippi River border cities preferential tax treatment); *Humphrey v. Thompson*, 222 Ark. 884, 763 S.W.2d 716 (1954) (no justification or special need existed for appropriating funds to establish a vocational-technical school in only one county).

*Weiss*, 368 Ark. at 310, 245 S.W.3d at 152.

The pertinent query in the circumstances of this case is whether there is a rational basis for limiting wagering on "electronic games of skill" to persons running a dog or horse track as done by Act 1151.[2]

These "electronic games of skill" are defined by Act 1151 to be "games played through any electronic device or machine that afford an opportunity for the exercise of skill or judgment where the outcome is not completely controlled by chance alone," Ark. Code Ann. § 23-113-103(5)(A), and, notably, "do *not* include pari-mutuel wagering on horse racing and greyhound racing . . . whether . . . live racing, simulcast racing, or races conducted in the past and rebroadcast by electronic means," Ark. Code Ann. § 23-113-103(5)(B) (emphasis supplied). It is, therefore, abundantly clear that these "electronic games of skill" are in no way dependent for their operation on the running of a dog or horse race at the same facility in which they are housed and utilized.

Indeed, these electronic games of skill can obviously be used at a hotel, a restaurant, a tavern, a truck stop, and so on, without a dog or a horse being within a hundred miles, and certainly there are citizens in Arkansas that (together with any employees and the communities in which they are situated) would economically prosper just as much as any dog/horse track from being able to offer electronic games of skill, assuming, of course, that the legislature's findings set forth in Act 1151 about these machines creating economic prosperity are, in fact, true.[3] It is noteworthy in this regard that our sister state of Louisiana does not limit these machines to dog or horse tracks. *See* La. Rev. Stat. Ann. § 27:311.

I harken back to this court's language in *Weiss* in holding the act there involved violated amendment 14's prohibition against local and special legislation, *viz: "Any* community located in some proximity to a park or tourist attraction could claim

---

[2] It is noted that gambling devices are prohibited by the general criminal laws of Arkansas. *See* Ark. Code Ann. §§ 5-66-104, -106. Gambling devices are defined by those laws as things "adapted, devised, or designed for the purpose of playing any game of chance, or at which any money or property may be won or lost." Ark. Code Ann. § 5-66-104. Also covered by these anti-gambling criminal statutes is betting on "any game of hazard or skill." Ark. Code Ann. § 5-66-113(a). Act 1151 operates to suspend the operation of these general criminal statutes of state-wide application relative to wagering on its "electronic games of skill" at authorized dog and horse tracks. Ark. Code Ann. § 23-113-602.

[3] There are certainly those who argue with some force that these gambling machines are a detriment to the economic health of citizens of an area where permitted.

comparable needs" to the City of Bigelow for $400,000 in State funds to fix their streets, sewer, etc. 368 Ark. at 309, 245 S.W.3d at 151 (emphasis supplied). Indeed, in the context of the present case cannot it be said that there are many citizens across Arkansas that have comparable needs for economic prosperity that could be addressed by revenue from electronic games of skill (assuming, again, the legislature is right in its finding that these machines generate such an economic benefit)? Rational thought or logic would also indicate that the State itself would derive greater tax and fee revenues from a wide, as opposed to concentrated, disbursement of these machines.

Why, then, limit the use of these machines to citizens whose only qualification is that they run a dog or horse track, and thereby exclude all other citizens of the State from legal use of same?[4] Appellee Oaklawn urges that the purpose behind the granting of a special privilege to dog and horse tracks to operate these gambling machines is to protect the business of horse (and presumably dog) racing, Appellee's Brief at Arg. 22-23, and certainly this is a reasonable construction of the legislative findings made in support of passage of Act 1151. However, is it a proper purpose to protect, and thereby promote the for-profit enterprises of a select few,[5]

---

[4] It should be noted at this juncture that this writer in no way advocates state-wide use of these machines, but only points out that what is made legal for one should be made legal for all unless there is a clear and reasonable rational basis to do otherwise.

[5] Oaklawn argues mightily that it does not have a corner on the horse racing business as others can qualify to get a franchise and thereby become eligible to have electronic games of skill. Appellants rightly point out the extreme difficulty under existing law to qualify for and hold one of these franchises. See, e.g., Ark. Code Ann. § 23-110-301(d) (only one franchise per county); Ark. Code Ann. § 23-110-303 (state-wide as opposed to local option election required); Ark. Code Ann. §§ 23-110-306, 23-111-306, 23-110-303 & 304, 23-111-303 & 304 (franchise holders other than Oaklawn and Southland have to face subsequent elections to maintain their franchises); Ark. Code Ann. §§ 23-110-305, 23-111-305 (new horse racing franchisees must invest at least $3 million in plant and equipment, and new dog racing franchisees must invest at least $1 million in plant and equipment). Indeed, there is real cause to believe that it is unreasonable to expect other Arkansans will seek one of these difficult to obtain and hard to keep horse or dog racing franchises, and certainly none have despite the passage of several decades. In such circumstances this court has said:

> Of course it may be argued that elasticity is found in the provision for reception of counties that may 'hereafter' fall within the circumscription. Practical operation, however, is to establish a system of road overseers by a process which excludes seventy-four other counties from the public policy so declared.

actually two, citizens *to the exclusion of all others* in the State of Arkansas? More pointedly, does amendment 14 to our Constitution permit the legislature to play favorites in handing out special privileges that these two, *and no one else*, can use to make money?

There must, of course, be a rational basis under amendment 14 for the granting of such a special privilege to such a select few Arkansas citizens. Although not addressed by the legislature in its findings, nor by the parties in their briefs, it has occurred to this writer that a possible reason for limiting the use of these machines to dog and horse tracks in Arkansas is because it is only at those places of business that one can legally make a wager or gamble in Arkansas subject to a limited exception for charitable bingo/raffles under Ark. Code Ann. § 23-114-101 et seq. Certainly it is the duty of this court to consider such a possible explanation for the granting of such a special privilege to a select two favorites. *Streight v. Ragland*, 280 Ark. 206, 214, 655 S.W.2d 459, 464 (1983).

Having noted the above, the clear terms of Act 1151 state that the running of a dog/horse track is irrelevant to the operation of these electronic games of skill[6] and, consequently, one is unable to discern any special expertise on the part of these dog/horse track operators that would make them specially or uniquely qualified to operate the subject machines and, furthermore, there is no reason to believe these dog/horse track people possess any special skill or expertise in running electronic games of skill machines.

---

*State ex rel. Burrow v. Jolly*, 207 Ark. 515, 518, 181 S.W.2d 479, 481 (1944). And there is the case of *Simpson v. Matthews*, 184 Ark. 213, 40 S.W.2d 991 (1931), where this court stated:

> It is a matter of judicial knowledge that Pulaski County is the only county in the State which contains over 75,000 inhabitants or which is likely to do so for any reasonable time in the future. No ordinary increase in population will place any other county in the same class within any reasonable time. No express words could have been used by the Legislature to limit the application of the act to Pulaski county more definitely than those employed.

*Id.* at 219, 40 S.W.2d at 993. There is, therefore, a clear basis in the precedents of this court to disregard the "anyone can get one" argument made by Oaklawn relative to dog/horse racing franchises. Having said that, there is a much more weighty constitutional concern in the context of this case, and that is whether the legislature may properly select only dog and horse tracks as special favorites to have a special privilege enjoyed by no one else to make money (all in the name of economic development and in order to protect and thereby promote the businesses of dog/horse tracks) given the prohibitions of amendment 14.

[6] *See* Ark. Code Ann. § 23-113-103(5).

There are those, however, who may still argue that what this is all about is gambling and handling the gambling activities of gamblers, and that the owners of dog/horse tracks know how to handle that sort of thing better than other folks in Arkansas because they have had considerable practice in the area of gambling on dog/horse races. If that be the criteria to hold that there is a rational basis under amendment 14 for limiting electronic games of skill machines to dog/horse tracks, then this writer cannot discern any limit on the special gambling legislation[7] that can be legitimately passed by the legislature notwithstanding amendment 14 for these dog/horse tracks to the exclusion of all others in Arkansas who might like to participate in the economic prosperity the legislature says comes from such things.

We are now at the heart of the conflict between amendment 14 and Act 1151 and at a core reason for the adoption of amendment 14 to our Constitution — a deep abiding concern about powerful special interests being able to legally get special favors from the legislature. It is this "playing of favorites" by the legislature that amendment 14 was specifically designed to stop, and so it should in this instance.

Simply put, there is no special skill or qualification held by a dog/horse track to run these electronic games of skill machines and, consequently, any law, including Act 1151, allowing *only them* to skirt the anti-gambling criminal laws of general application throughout our State would be unconstitutional under amendment 14 as prohibited "special" legislation as there is no rational basis for granting them, *and only them*, the exclusive right to use these electronic games of skill.

Instructive here are the laws pertaining to gambling at bingo. *See* Ark. Code Ann. § 23-114-101 et seq. They are in no way limited to dog/horse tracks. The point is that just because one is skilled at pari-mutuel betting on dog/horse races, does not mean they have any special skills or expertise at another type of gambling

---

[7] What's next? Making book on college football games? Roulette? Blackjack? Poker? Dice games? Is casino gambling already here in Arkansas? Probably so, much to the chagrin of the People of Arkansas (who probably think they get to vote on such things) as they are only another special act of the legislature away from every type of gambling a casino can offer. Indeed, one might reasonably argue that Act 1151 is an end run around the voters of Arkansas.

such as electronic games of skill which the legislature was careful to point out are "not" related to racing a dog or horse. *See* Ark. Code Ann. § 23-113-103(5)(B).

In conclusion, I would observe the following language of this court in these types of cases: "[I]n determining whether a law is public, general, special, or local, the courts will look to its substance and practical operation rather than to its title, form, and phraseology, 'because otherwise prohibitions of the fundamental law against special legislation would be nugatory.' " *State ex rel. Burrow v. Jolly*, 207 Ark. 515, 517-18, 181 S.W.2d 479, 480 (1944); *see also Laman v. Harrill*, 233 Ark. 967, 349 S.W.2d 814 (1961)(quoting same language with approval).

I would reverse the trial court with directions to enter judgment finding Act 1151 unconstitutional under amendment 14 to the Arkansas Constitution.