Tim LEATHERS, Commissioner of Revenues; Martha Ahrent, George Dunklin, Marvin Hare, David Hillman, Jerry Hoskyn, John King, Jon Lambi, Carl Morrison, and Joe Rennicke, In Their Capacities as Directors of the Arkansas Rice Research and Promotion Board; and Riceland Foods, Inc.; Producers Rice Mill, Inc., Riviana Foods, Inc. (Intervenors) *v.* GULF RICE ARKANSAS, INC., and Gulf Pacific Rice Co., Inc.

98-737 994 S.W.2d 481

Supreme Court of Arkansas
Opinion delivered July 15, 1999

*Winston Bryant*, Att'y Gen., by: *Arnold M. Jocums*, Ass't Att'y Gen., for appellant Arkansas Rice Research and Promotion Board.

*Friday, Eldredge & Clark*, by: *William Waddell, Jr.*, for appellant David Hillman.

*Michael J. Wehrle*, for appellant Arkansas Dep't of Finance and Administration, Revenue Division.

*Hill, Gilstrap, Perkins, & Warner*, by: *G. Alan Perkins*, for appellants/intervenors Riceland Foods Inc., Producers Rice Mill, Inc, and Rivana Foods, Inc.

*Hilburn, Calhoon, Harper, Pruniski & Calhoon, Ltd.*, by: *David M. Fuqua*, for appellees.

Tom Glaze, Justice. Appellees Gulf Rice Arkansas, Inc., and Gulf Pacific Rice Co., Inc. (referred to collectively as "Gulf Rice"), filed suit against appellants Tim Leathers, the State Commissioner of Revenues, and the individual directors of the Arkansas Rice Research and Promotion Board (referred to collectively as "Board"). Riceland Foods, Inc., Producers Rice Mill, Inc., and Riviana Foods, Inc. (referred to collectively as "Riceland Foods"), intervened in the suit on behalf of the Board. Gulf Rice alleged that Act 344 of 1995, the Arkansas Research and Promotion Act, codified at Ark. Code Ann. § 2-20-511 (Repl. 1996), was an illegal delegation of the taxing power that violated Article 2, § 23, and Article 16, § 13, of the Arkansas

Constitution. Both parties moved for summary judgment, Gulf Rice claiming that Act 344 was an unlawful delegation of legislative authority and a violation of due process. The chancery court agreed that the delegation was an unlawful delegation of legislative authority and granted summary judgment in favor of Gulf Rice. The Board and Riceland Foods appeal, claiming the delegation in Act 344 is constitutional. We affirm the chancery court's grant of summary judgment.

In 1985, the General Assembly enacted Act 725, codified at Ark. Code Ann. § 2-20-507 (Repl. 1996), which created the Arkansas Rice Research and Promotion Board composed of nine producer members. Act 725 also imposed an assessment of three cents per bushel on all rice grown within the state to be paid by the producer. Before the assessment could be imposed, the producers were required to approve it by a three-fifths vote. The assessment was mandatory, but under Ark. Code Ann. § 2-20-509, any rice producer could request and receive a refund by making written application to the Director of the Department of Finance and Administration.

In 1995, the General Assembly enacted Act 344, providing for an alternative assessment on rice. Act 344 authorized the Arkansas Rice Research and Promotion Board to refer to the rice producers of the state the issue of authorizing an assessment of 1.35 cents per bushel against rice buyers and up to 1.50 cents per bushel against rice producers.[1] Only rice producers were allowed to vote to impose the assessments, both against themselves and against the rice buyers. Pursuant to § 2-20-511(b)(2), neither rice buyers nor rice producers could receive a refund once the assessment had been imposed pursuant to the statute.

In February 1996, a referendum on the assessment against the rice buyers was submitted to the rice producers; they approved the imposition of the 1.35 cent assessment in a vote of 4,271 in favor and 1,649 opposed. The funds derived from the assessment

---

[1] Act 344 of 1995 provided that the authorized assessments were 1.35 cents per bushel to be paid by the buyers and up to 1.50 cents per bushel to be paid by the producers. As codified, however, § 2-20-511 provides for assessments of one dollar and thirty-five cents and up to one dollar and fifty cents.

against rice buyers are designated for use for rice promotion and market development; the funds derived from the assessment against the rice producers are designated for use for rice research.

■ ■ In support of their argument that summary judgment was improper, appellants assert that Act 344 must be presumed constitutional, and that the approval process set forth in Act 344 has been consistently upheld by this court as well as the Supreme Court and other appellate courts. The doctrine prohibiting delegation of legislative power has long been recognized, but the Court has also recognized that Congress may delegate its decision-making authority within certain limits. Appellants argue the delegation in this case falls within these limits, citing *Currin v. Wallace*, 306 U.S. 1 (1939), and *U.S. v. Rock Royal Co-Operative, Inc.*, 307 U.S. 496 (1939). In *Rock Royal*, the Court set out the general test to determine whether a delegation is constitutional:

> [E]ach enactment must be considered to determine whether it states the purpose which the Congress seeks to accomplish and the standards by which that purpose is to be worked out with sufficient exactness to enable those affected to understand these limits. Within these tests the Congress needs specify only so far as is reasonably practicable.

*Rock Royal*, 307 U.S. at 574. In determining whether an unconstitutional delegation has been made, the Court considers whether Congress "has attempted to abdicate, or to transfer to others, the essential legislative functions with which it is vested by the Constitution," noting that "legislation must often be adapted to conditions involving details with which it is impracticable for the legislature to deal directly." *Currin*, 306 U.S. at 15.

The appellants argue that because the legislature has specified the amount of the assessment and who is to pay it, the legislature has not unlawfully delegated its authority. They assert that the vote by the producers is merely a condition upon which the legislation may become operative and is therefore permissible. We do not agree.

In the instant case, the General Assembly set the 1.35 cent assessment and the Board, comprised of rice producers, was given the authority to call and administer the referendum whereby the

rice producers would decide whether rice buyers should be assessed. It is clear that Act 344, without restriction, bestowed private rice producers with the power to shift their existing burden to pay assessments to rice buyers.

■ The theory of the appellees' case is that the unlawful delegation of legislative authority in this matter exists because Act 344 empowered the rice producers with the sole discretion of levying an assessment against the rice buyers without giving the buyers a vote, much less a hearing or review, on the assessment. In sum, appellees submit that to deny them a vote in these circumstances is a due process violation.[2] In support of their argument, appellees cite *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936), for the proposition that the exclusion of an affected group (here rice buyers) from the referendum was a federal constitutional defect founded on the lack of due process given those adversely affected by the referendum. In *Carter*, the Court said:

> The power conferred upon the majority is, in effect, the power to regulate the affairs of an unwilling minority. This is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumably disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business.

*Carter*, 298 U.S. at 311. The appellants attempt to distinguish the *Carter* decision based on the fact that the Board here was given the authority to call a referendum. However, the constitutional issue is whether the rice buyers are denied the right to vote in the referendum regardless of who statutorily calls the referendum. Even if it were relevant that the Board rather than the producers called the referendum, the fact remains that the Board was composed wholly of rice producers.

---

[2] The dissenting opinion goes to considerable length to suggest appellees failed to sufficiently raise and develop their due process argument. First, appellants make no suggestion that the appellees failed to preserve this constitutional issue. Second, we believe it becomes evident that both parties skillfully researched, briefed, and argued their respective legal constitutional theories by a fair reading of this opinion. We note that nothing else need be said on this point.

 Besides failing to provide convincing authority that the *Carter* decision should not be followed in the instant case, the appellants cite cases that tend to support appellees' argument more than the appellants'. In this respect, appellants cite federal cases where laws were held not to be unlawful delegations of legislative power when agricultural commodity programs were put into execution by way of referendums. *See Parker v. Brown*, 317 U.S. 341 (1943); *Currin v. Wallace*, 306 U.S. 1 (1939); *Wileman Bros. & Elliott, Inc. v. Espy*, 58 F.3d 1367 (9th Cir. 1995); *United States v. Frame*, 885 F.2d 1119 (3d Cir. 1989). While Arkansas has no similar cases dealing with commodity programs, this court has recognized the rule that, although the General Assembly cannot delegate its power to make a law, it can make a law and prescribe the condition upon which it may become operative. *Miller v. Witcher*, 160 Ark. 479, 254 S.W. 1063 (1923); *see also Swanberg v. Tart*, 300 Ark. 304, 778 S.W.2d 931 (1989). However, in each of these cases, both federal and state, the challenge to the referenda was brought by plaintiffs who had an opportunity to vote on the legislative issue affecting them.

██ ██ The same holds true in the other jurisdictions cited by appellants. *See Dukesherer Farms, Inc. v. Ball*, 273 N.W.2d 877 (Mich. 1979) (cherry producers brought unsuccessful challenge to Michigan Agricultural Commodities Marketing Act, a statute requiring a referendum of affected producers); *Wickham v. Trapani*, 272 N.Y.S.2d 6 (N.Y. App. Div. 1966) (apple growers unsuccessfully challenged assessment on growers ratified in a referendum by growers; all "interested persons" were apprised of and allowed to vote on the referendum and the court found this satisfied due process). In sum, the cases relied on by appellants are fundamentally different from the situation at hand where the legislation, Act 344, fails to give the affected persons — rice buyers — a right to vote in the referendum. The Michigan Supreme Court in the *Ball* decision explicitly spells out the error of the appellants' position as follows:

> The requirement of a referendum . . . need not constitute improper delegation [of legislative authority], but can simply be a measured decision by the Legislature to allow those *most intimately affected* to decide whether forming a marketing program as

presented in the Act and approved by the Director is a proper manner in which to effectuate their business goals. As long as this is carried forth under sufficient standards and safeguards set up by the Legislature under the Act, or other legislation applicable thereto, there is no improper delegation of authority.

*Ball*, 273 N.W.2d at 889 (emphasis added). Additionally, as one treatise has noted, "a significant number of states have voided efforts by state governments to vest their lawmaking authority in private persons or entities." ARTHUR E. BONFIELD & MICHAEL ASIMOW, STATE AND FEDERAL ADMINISTRATIVE LAW § 7.3, at 460 (1989). The treatise writers explain the states' rationale as follows:

> [T]hat private parties might "make rules that placed personal gain ahead of the public welfare . . . [and] the absence of neutral [and independent] administrative agency review of the private parties' determination would encourage self-serving policies. This latter aspect was particularly troublesome . . . because the private parties themselves were not subject to any political control . . . . [However], . . . a rule that a private party proposes is not constitutionally suspect if it is adopted by an administrative agency that has power to accept, reject, or modify the rule."

*Id.* (quoting Ira P. Robbins, *The Impact of the Delegation Doctrine on Prison Privatization*, 35 U.C.L.A. L. REV. 911 (1988)). Here, Act 344 not only fails to allow the rice buyers a vote to decide on whether the rice promotion and marketing program should be effectuated, the Act fails entirely to provide rice buyers any safeguards or standards by which the assessment referendum can be measured.

*Rock Royal* is the *only* case cited by appellants where commodity (milk) producers were solely permitted to vote to effectuate legislation when other affected persons (milk handlers) were denied the right to vote on the issue. *United States v. Rock Royal Coop.*, 307 U.S. 533 (1939). Even so, in *Rock Royal*, due process safeguards and standards were an inextricable part of the legislation in question. Among other things, the legislation provided that milk handlers should generally approve any order fixing prices paid by milk handlers to milk producers. However, if the milk handlers did not approve the order, the Secretary of Agriculture

could issue the order fixing prices if he or she made a special determination and obtained approval of the President. If the Secretary did not make the special determination, but made certain other determinations, the Secretary could allow the milk producers to effectuate the order by referendum. In any event, notice, opportunity for hearing, and review were afforded the milk handlers before any order was issued. In addition, the Agricultural Marketing Act at issue in *Rock Royal* provided that the Secretary had a list of factors to consider before an order was made fixing minimum prices.

Appellants also cite *Currin* in support of their argument that the delegation in this case should be upheld. *Currin v. Wallace*, 306 U.S. 1 (1939). However, *Currin* supports the appellees' argument more than the appellants'. In *Currin*, the tobacco growers were given authority by the Tobacco Inspection Act to vote to impose inspection and certification procedures on their tobacco before it could be sold. Tobacco warehousemen challenged the act and the Supreme Court found the voting provision to be lawful. However, the tobacco warehousemen who challenged the act were only indirectly affected by the act, if at all. Rather, those who were intimately affected by the act, the growers, were given the opportunity to determine whether it would apply to them.

Finally, appellants offer a rather disingenuous argument that, because the General Assembly has the unrestricted authority to impose an assessment on rice producers and rice buyers, the vehicle or procedure by which the assessment is imposed is of no import. Stated in other terms, their argument is that if the General Assembly has the power to make the assessments contained in Act 344, it is of no importance who is given the authority to place the Act in execution. Appellants offer no citation of authority to support such a bare proposition and such a summary legal conclusion totally ignores the appellees' due process argument.

■ In the present case, Act 344 directs the rice buyers to pay a rice assessment, without specifying any standards or factors that *anyone* (including the Board) must consider before imposing the assessment; nor does the Act afford the buyers any notice, hearing, or review before such an assessment is imposed on them.

434

This unlawful empowerment given private rice producers is especially offensive when it affects other private persons like rice buyers who have interests opposing or adverse to those of the producers.[3] Because we have determined that Act 344 is an unconstitutional delegation of legislative authority, we affirm the trial court's grant of summary judgment.

Affirmed.

BROWN, J., Special Associate Justices TED SANDERS and STEVEN B. DAVIS dissent; CORBIN and THORNTON, JJ., not participating.

ROBERT L. BROWN, Justice, dissenting. This is an important case. It has now become vastly easier, in light of the majority opinion, for this court to rule an act of the General Assembly unconstitutional. I would follow existing law and require Gulf Rice to prove a "clear incompatibility" between the legislative act and the State Constitution before we strike down Act 344 of 1995. *See Boyd v. Weiss*, 333 Ark. 684, 971 S.W.2d 237 (1998); *McCutcheon v. Huckabee*, 328 Ark. 202, 943 S.W.2d 225 (1997); *Stratton v. Priest*, 326 Ark. 469, 932 S.W.2d 321 (1996); *Fayetteville Sch. Dt. No. 1 v. Arkansas State Bd. of Educ.*, 313 Ark. 1, 852 S.W.2d 122 (1993). Because we presume acts of the General Assembly to be constitutional, and because Gulf Rice clearly did not sufficiently develop its novel theory of due process before the chancery court, either factually or legally, I would reverse and remand the matter to the chancery court for trial. This would not foreclose Gulf Rice from further developing its due-process claim.

The grounds for attacking the Rice Assessment Act (Act 344 of 1995) before the chancery court were (1) unlawful delegation of legislative authority, and (2) illegal exaction in the form of an illegal assessment. Nowhere in the complaint brought by Gulf Rice was a violation of the Due Process Clause mentioned. Nor

[3] A second issue was raised below but left undecided by the trial court — whether the 1.35 cent assessment is a valid fee or an illegal tax. Because we agree with the chancellor that Act 344 is unconstitutional as an unlawful delegation of legislative power, it is unnecessary to consider whether the Act's assessment is also invalid as an illegal exaction.

was it mentioned in Gulf Rice's motion for summary judgment. (A passing reference was made to due process in its brief supporting the motion, but it is certainly a stretch to say that this was a ground for relief in the motion.) Nor was due process mentioned in the chancery court's letter opinion or in the court's order granting summary judgment. Counsel for Gulf Rice candidly admitted this at oral argument. He further admitted that he did not argue to the chancery court that fundamental due process was an essential underpinning of any claim that the General Assembly has unlawfully delegated its legislative authority to another entity. Yet, the majority seizes on due process, which clearly was not developed as an issue before the chancery court, and catapults it into *the* basis for voiding the Rice Assessment Act. Because this seems particularly unfair to the Rice Board, which, understandably thought the issue before the chancery court was unlawful delegation of authority, I would reverse and remand.

Whether the General Assembly can fix an assessment on first buyers of rice and then authorize a state board — the Arkansas Rice Research and Promotion Board — to call a referendum on that assessment with only rice producers voting is a new issue, not only in Arkansas but nationwide. It is, quite simply, an issue of national significance. That makes summary judgment a particularly dubious procedure to follow when a major issue of first impression is involved and this is especially true when a new ground — due process — was given short shrift by Gulf Rice before the chancery court. The majority, in a footnote, says the due-process issue was skillfully briefed. It was briefed only on appeal to this court after Gulf Rice had switched strategies and asserted a new constitutional basis for affirmance.

What the majority has overlooked is that the General Assembly developed a complete plan with Act 344. It set the promotion fee at 1.35 cents and then empowered the Rice Board to call a referendum. Counsel for Gulf Rice did not dispute the completeness of the assessment plan in oral argument before this court. This court has previously held that an act does not constitute an unlawful delegation of legislative authority when the act presents a complete plan of what will occur after the referendum. *See, e.g., Boyd v. Weiss, supra; Swanberg v. Tart*, 300 Ark. 304, 778 S.W.2d

931 (1989). Thus, this situation is totally different from *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936), where Congress delegated to coal producers the authority to set wages and hours for the coal industry. Yet, *Carter Coal* is the only case cited by the majority in support of its conclusion.

The reasons why affirmance of summary judgment on a new ground is premature and inappropriate in this case are numerous:

- It is still unclear what brand of due process is being endorsed here. The majority cites as its keystone case a substantive due process case from the thirties, (*Carter v. Carter Coal Co.*, *supra*), which is factually distinguishable. The *Carter Coal* case has also been called into question. *See also Knight v. Minnesota Community College Faculty Assoc.*, 571 F. Supp. 1, 4 (D.C. Minn. 1982) ("the continuing vitality of *Carter Coal* is doubtful at best.") Counsel for Gulf Rice, however, contended at oral argument that what he is really claiming is a procedural-due-process violation. Which is it?

- Where is the caselaw to support this theory of procedural due process?

- Is the due-process claim a separate basis for relief or is it an integral part of Gulf Rice's unlawful delegation claim?

- If due process is the basis for voiding Act 344, should the Rice Board not have the opportunity to argue that there is a legitimate government interest or rational basis at stake here? *See, e.g., Johnson v. Sunray Services, Inc.*, 306 Ark. 497, 816 S.W.2d 582 (1991).

- Does rice promotion benefit first buyers of rice who resell their rice to the same extent as it benefits rice producers?

- Does Gulf Rice, as a first buyer of rice, pass the assessment cost back to rice producers by reducing the price paid for the rice? Roger Gilmore, general manager for Gulf Rice Arkansas, was ambivalent on this point in his deposition.

- Though the Rice Board is made up of nine rice producers, to what extent are the producers also first buyers? It was contended that in many cases, a rice concern may be both.

- Act 344 limits rice producers to producers in Arkansas. Can first buyers, who are global in scope, be identified for referendum purposes?

The reason why acts of the General Assembly are presumed constitutional is grounded in the bedrock principle of separation of powers between the legislative and judicial branches of government. The General Assembly fixes policy, and it is presumed to have considered the ramifications of its legislation. The majority, however, appears to presume unconstitutionality. We should not rush to void a legislative enactment on some vague notion of unfairness without full development of the issue before the chancery court and with both sides knowing what the issues are. I would hold Gulf Rice to its burden of proof.

I respectfully dissent.

Special Justice TED H. SANDERS joins.

Special Justice STEVEN B. DAVIS joins.