2012 Ark. 293

Ray HOBBS, Director, Arkansas Department of Correction; and Arkansas Department of Correction, Appellants/Cross–Appellees

v.

Jack Harold JONES; Marcel Williams; Frank Williams; Jason McGehee; Don Davis; Bruce Ward; Stacey Johnson; Alvin Jackson; Kenneth Williams; and Terrick Nooner, Appellees/Cross–Appellants.

No. 11–1128.

Supreme Court of Arkansas.

June 22, 2012.

Dustin McDaniel, Atty. Gen., C. Joseph Cordi, Jr., Asst. Atty. Gen., for Appellants.

Scott W. Braden, Josh Lee, Dale E. Adams, Jeff Rosenzweig, Deborah R. Sallings, Little Rock, for Appellees.

JIM GUNTER, Justice.

Appellants/cross-appellees, the Arkansas Department of Correction and its director, Ray Hobbs, and appellees/cross-appellants, a group of several prisoners awaiting execution on Arkansas's death row, appeal an order of the Pulaski County Circuit Court granting in part and denying in part cross-motions for summary judgment. We have jurisdiction over this appeal as it involves issues pertaining to the interpretation or construction of the Arkansas Constitution. *See* Ark. Sup.Ct. R. 1–2(a)(1) (2011). We affirm the circuit court's order to the extent it declared Ark. Code Ann. § 5–4–617 (Supp.2011), unconstitutional and found that certain claims presented by the prisoners were moot. We reverse the circuit court's order striking language from the statute and granting injunctive relief.

On March 8, 2010, Jack Harold Jones, a prisoner incarcerated on Arkansas's death row, filed suit against Ray Hobbs, in his official capacity as Director of the Arkansas Department of Correction, and the Arkansas Department of Correction (hereinafter collectively referred to as "ADC"). Jones asserted that the Method of Execution Act of 2009 ("MEA"), codified at Ark. Code Ann. § 5–4–617, violates the separation-of-powers doctrine in article 4 of the Arkansas Constitution. Jones was scheduled to be executed on March 16, 2010. He maintained that his claim was timely because this court had only recently held that the MEA was retroactively applicable to currently incarcerated death-row inmates. Jones asked the court to grant preliminary injunctive relief to stay his execution during the pendency of the case, to enter declaratory judgment that Jones's execution pursuant to the MEA was unconstitutional, and to grant permanent injunctive relief barring Jones's execution until passage of a new statute incorporating standards to satisfy the Arkansas Constitution.

On July 29, 2010, Jones filed an amended complaint, listing a total of six claims: (1) that the MEA was an unconstitutional violation of the separation-of-powers doctrine; (2) that his execution would violate the Federal Food, Drug & Cosmetic Act (FDCA), codified at 21 U.S.C. §§ 301 et seq., because the ADC lacked a valid prescription for the drugs it intended to use during Jones's execution; (3) that his execution would violate the FDCA because the drugs the ADC intended to use had not been approved by the Food and Drug

Administration (FDA); (4) that his execution would violate the Federal Controlled Substances Act (CSA), codified at 21 U.S.C. §§ 801 et seq., because the ADC lacked a valid prescription for the drugs it intended to use during his execution; (5) that his execution would violate the CSA because the ADC staff were to administer controlled substances to Jones without proper registration; and (6) that his execution would violate the Nurse Practices Act (NPA), codified at Ark.Code Ann. § 17–87–101, because the ADC intended to use lay persons to administer the drugs during execution. Jones again sought declaratory and injunctive relief. With permission of the circuit court, nine other death-row inmates, including Stacy Eugene Johnson, Alvin Jackson, Kenneth Williams, Bruce Earl Ward, Jason McGehee, Don W. Davis, Marcel Williams, Frank Williams Jr.,[1] and Terrick Nooner (hereinafter collectively referred to with Jones as "the prisoners"), subsequently filed complaints in intervention asserting substantially the same claims and requesting the same relief as Jones in his amended complaint.

On August 17, 2010, ADC filed a motion to dismiss the prisoners' amended complaints on the basis that they failed to state a claim upon which relief could be granted pursuant to Ark. R. Civ. P. 12(b)(6). It argued that dismissal was appropriate because the lethal-injection statute set forth general execution provisions but left the details to the director of the ADC; because the CSA and the FDCA were not enacted to regulate capital punishment and did not authorize a private cause of action; and because the NPA did not govern the administration of lethal drugs during execution. Following a hear-ing, the circuit court entered an order on December 16, 2010, granting ADC's motion to dismiss with regard to the FDCA, CSA, and NPA. Accordingly, it dismissed claims two, three, four, five, and six of the prisoners' amended complaints. It denied ADC's motion as to the separation-of-powers claim.

On January 24, 2011, the prisoners filed a supplemental complaint arguing that the ADC intended to execute them using "chemicals obtained from an overseas driving school purporting to distribute drugs from a non-FDA approved manufacturing source." The prisoners alleged that the ADC refused to disclose any information about the chemicals or how they were procured. The prisoners added three claims: (1) that use of non-FDA approved chemicals purchased from a foreign driving school violated the prohibition against cruel and unusual punishment in the Eighth Amendment and article 2, section 9 of the Arkansas Constitution (claim seven); (2) that the ADC was suppressing information necessary to scrutinize the identity, strength, quality, and purity of the drugs obtained in violation of the due process clauses contained in the Fourteenth Amendment and article 2, section 8 of the Arkansas Constitution (claim eight); and (3) that use of the non-FDA approved drugs obtained from a foreign driving school would violate the prisoners' rights to due process and rights to be free from cruel and unusual punishment (claim nine). The prisoners asked for temporary, preliminary, and permanent injunctive relief to enjoin the ADC from executing prisoners with the non-FDA approved chemicals and declaratory relief. On February 16, 2011, ADC moved to dismiss claims eight

1. After the circuit court entered its final order in this case, we reversed and remanded Frank Williams Jr.'s death sentence and ordered that he be resentenced. *Williams v. State,* 2011 Ark. 534, 2011 WL 6275536. As a result, Williams no longer has any justiciable interest in the outcome of this lawsuit.

and nine as set forth in the supplemental complaint on the basis that the prisoners had access to the courts, particularly the circuit court involved in this litigation, and that the prisoners failed to state a claim upon which relief could be granted. The circuit court granted ADC's motion to dismiss with regard to claim eight but denied its request to dismiss claim nine.

ADC filed a motion for summary judgment on May 4, 2011, asserting that it was entitled to judgment as a matter of law on the three remaining claims alleged by the prisoners. Specifically, it maintained that claims seven and nine failed because the prisoners had not and could not provide any evidence that the use of the non-FDA approved chemicals created any substantial risk of serious harm. Further, the ADC contended that with regard to claim one, the facial challenge to the MEA on the basis of separation of powers, it was entitled to judgment as a matter of law because the statute could be applied constitutionally and provided sufficient guidance to executive officials in administering executions. The prisoners filed a cross-motion for summary judgment as to claim one regarding the constitutionality of the MEA on May 31, 2011, asserting that the MEA delegates policymaking discretion to the ADC director without setting forth reasonable standards for the exercise of that discretion in violation of the separation-of-powers clause of the Arkansas Constitution.

Thereafter, on July 21, 2011, ADC filed a second motion for summary judgment asking the court to enter judgment as a matter of law as to claims seven and nine on the basis of mootness. ADC claimed that it had disposed of all lethal chemicals that it had received from the overseas supplier, Dream Pharma, and that it was unable to obtain any additional chemicals from that supplier. Therefore, ADC asserted that there was no further controversy surrounding the lethal-injection chemicals obtained from Dream Pharma, which was the basis for claims seven and nine, and that those claims should be dismissed as moot.

The court held a hearing on the motions on August 15, 2011, and after hearing arguments from counsel, ruled from the bench that the cross-motions for summary judgment were granted in part and denied in part. It found the MEA unconstitutional and struck the language "any other chemical or chemicals, including but not limited to" from Ark.Code Ann. § 5–4–617(a)(2)(D). The circuit court ordered that only the words "saline solution" remain in § 5–4–617(a)(2)(D). In addition, the court granted in part and denied in part ADC's second motion for summary judgment, finding that the motion was granted in all respects except that ADC was enjoined from using any sodium thiopental obtained in violation of any state or federal law. The court issued a final, written order on August 29, 2011, reflecting its bench ruling. ADC filed a notice of appeal from the final order on September 1, 2011. The prisoners filed a notice of cross-appeal on September 22, 2011, from the final order as well as the December 16, 2010 order granting in part ADC's motion to dismiss claims two, three, four, five, and six; discovery orders entered on December 16, 2010, and October 20, 2010; and the April 7, 2011 order granting in part ADC's motion to dismiss claim eight.[2]

---

2. The prisoners make no argument in their brief on appeal with regard to any of these intermediate orders. Therefore, those arguments have been abandoned for purposes of appeal and need not be addressed. *Durham v. Marberry,* 356 Ark. 481, 156 S.W.3d 242 (2004).

## I. Constitutionality of Ark.Code Ann. § 5–4–617

For its first point on appeal, ADC maintains that the circuit court erred in finding that Ark.Code Ann. § 5–4–617 is facially unconstitutional and erred in striking a portion of the statute. It contends that because Ark.Code Ann. § 5–4–617 can be applied in a manner that fully comports with the prohibition on cruel and unusual punishment in both the federal and state constitutions, the prisoners' argument that the statute is unconstitutional on its face fails. Moreover, ADC argues that the doctrine of separation of powers is not violated where the legislature merely makes law and then confers authority or discretion with regard to execution of that law to the executive branch. The legislature can set forth general provisions and give power to the executive branch to complete the details. Additionally, where the Arkansas Constitution is silent on which branch of government possesses the power to determine the precise conditions to carry out a criminal sentence, the legislature may delegate that power to the executive branch. Here, ADC contends that the legislature did just that with the MEA and furthermore, although unnecessary, gave significant guidance to the executive branch in how to accomplish that general purpose.

The prisoners maintain, in their response on direct appeal and their argument on cross-appeal, that the circuit court was correct to find that the MEA violates the separation-of-powers doctrine but that it erred in striking a portion of the MEA. The prisoners maintain that because the MEA provides no guidelines for the ADC in carrying out lethal-injection executions and allows the ADC unfettered discretion in determining the chemicals to be used and the policies and procedures for administering lethal injection, it is an unconstitutional delegation of legislative power. Additionally, the prisoners assert that as altered by the circuit court, the statute remains constitutionally infirm, and alternatively that it is not severable.

Ordinarily, on appeal from a summary-judgment disposition, the evidence is viewed in the light most favorable to the party resisting the motion, and any doubts and inferences are resolved against the moving party. *Aloha Pools & Spas, Inc. v. Employer's Ins. of Wausau,* 342 Ark. 398, 39 S.W.3d 440 (2000). However, in a case where the parties agree on the facts, we simply determine whether the appellee was entitled to judgment as a matter of law. *Id.* When parties file cross-motions for summary judgment, as was done in this case on this point, they essentially agree that there are no material facts remaining, and summary judgment is an appropriate means of resolving the case. *McCutchen v. Patton,* 340 Ark. 371, 10 S.W.3d 439 (2000). As to issues of law presented, our review is de novo. *Preston v. Stoops,* 373 Ark. 591, 285 S.W.3d 606 (2008).

Statutes are presumed constitutional, and the burden of proving otherwise is on the challenger of the statute. *Paschal v. State,* 2012 Ark. 127, at 8, 388 S.W.3d 429. If it is possible to construe a statute as constitutional, we must do so. *Id.* Because statutes are presumed to be framed in accordance with the Constitution, they should not be held invalid for repugnance thereto unless such conflict is clear and unmistakable. *Id.* Moreover, when interpreting statutes, we make a de novo review, as it is for this court to decide what a statute means. *Baker Refrigeration Sys., Inc. v. Weiss,* 360 Ark. 388, 201 S.W.3d 900 (2005). Thus, although we are not bound by the trial court's interpretation, in the absence of a showing that the trial court erred, its interpretation will be accepted as correct on appeal. *Id.* The

basic rule of statutory construction is to give effect to the intent of the legislature. *Ward v. Doss*, 361 Ark. 153, 205 S.W.3d 767 (2005). Where the language of a statute is plain and unambiguous, we determine legislative intent from the ordinary meaning of the language used. *Id.* In considering the $\lfloor_9$ meaning of a statute, we construe it just as it reads, giving the words their ordinary and usually accepted meaning in common language. *Id.* We construe the statute so that no word is left void, superfluous or insignificant, and we give meaning and effect to every word in the statute, if possible. *Id.*

 Within our state constitution is a specific separation-of-powers provision, providing:

§ 1. The powers of the government of the State of Arkansas shall be divided into three distinct departments, each of them to be confided to a separate body of magistracy, to-wit: Those which are legislative, to one, those which are executive, to another, and those which are judicial, to another.

§ 2. No person or collection of persons, being of one of these departments, shall exercise any power belonging to either of the others, except in the instances hereinafter expressly directed or permitted.

Ark. Const. art. 4, §§ 1, 2. In *Department of Human Services v. Howard*, 367 Ark. 55, 238 S.W.3d 1 (2006), we explained the specific powers delegated to each branch. The legislative branch of the state government has the power and responsibility to proclaim the law through statutory enactments. *Id.* The judicial branch has the power and responsibility to interpret the legislative enactments. *Id.* The executive branch has the power and responsibility to enforce the laws as enacted and interpreted by the other two branches. *Id.* The doctrine of separation of powers is a basic principle upon which our government is founded, and should not be violated or abridged. *Id.*

Although on many occasions we have noted that the legislature cannot delegate its power to proclaim the law to one of its sister branches of government, we have recognized that it can delegate discretionary authority to the other branches:

While it is a doctrine of universal application that the functions of the Legislature must $\lfloor_{10}$ be exercised by it alone and cannot be delegated, it is equally well settled that the Legislature may delegate to executive officers the power to determine certain facts, or the happening of a certain contingency, on which the operation of the statute is, by its terms, made to depend.

. . . .

If the law is mandatory in all it requires and all it determines, it is a legislative act, although it is put into operation by officers or administrative boards selected by the Legislature.

*State v. Davis*, 178 Ark. 153, 156, 10 S.W.2d 513, 514 (1928); *see also Ark. S. & L. Ass'n Bd. v. West Helena S. & L.*, 260 Ark. 326, 538 S.W.2d 560 (1976) (noting that legislature cannot delegate its lawmaking power but can delegate where the power is not purely legislative in nature). We have held that "[t]he true distinction is between the delegation of power to make the law, which necessarily involves the discretion as to what it shall be, and conferring authority or discretion as to its execution to be exercised under and in pursuance of the law. The first can not be done. To the latter no valid objection can be made." *Terrell v. Loomis*, 218 Ark. 296, 300, 235 S.W.2d 961, 963 (1951) (quoting *Cincinnati, Wilmington & Zanesville, R.R. Co. v. Comm'rs of Clinton County*, 1 Ohio St. 77 (1852)).

Consequently, this court has held that such discretionary power may be delegated by the legislature to a state agency as long as reasonable guidelines are provided. *Bakalekos v. Furlow,* 2011 Ark. 505, 385 S.W.3d 810. This guidance must include appropriate standards by which the administrative body is to exercise this power. *Id.* A statute that, in effect, reposes an absolute, unregulated, and undefined discretion in an administrative agency bestows arbitrary powers and is an unlawful delegation of legislative powers. *Id.*

In *State v. Bruton,* 246 Ark. 293, 437 S.W.2d 795 (1969), we held unconstitutional a statute that gave the state penitentiary board the authority to dictate the mode and extent of punishment for prisoners violating prison rules and to prescribe for its employees what conduct constituted felonious behavior. The statute provided that "any superintendent, subordinate officer or guard having in his charge any convicts who shall himself, or who shall cause any other person to inflict on any convict any greater or more severe punishment than is prescribed by said board, said superintendent, subordinate officer or guard shall be deemed guilty of a felony." Ark. Stat. 46–158. In concluding that the statute was an unconstitutional delegation of legislative power, we noted that the statute gave no guidelines to the penitentiary board, that the board had sole discretion in determining the limits of conduct, and that without guidance, it could set minimums and extremes of punishment without restraint. *Bruton, supra.*

Additionally, in *Walden v. Hart,* this court held that a statute that allowed the city commissioner or chief of police to designate and authorize what constituted an ambulance or emergency vehicle was unconstitutional because the statute gave unbridled discretion to the city authorities without providing reasonable guidelines. 243 Ark. 650, 420 S.W.2d 868 (1967). This court focused on the fact that the statute at issue did not delineate specific questions or facts for the city official to answer or ascertain prior to authorizing a vehicle as an ambulance or emergency vehicle. Nearly two decades later, in *Venhaus v. State ex rel. Lofton,* 285 Ark. 23, 684 S.W.2d 252 (1985), we relied on *Walden* in holding unconstitutional a statute that vested unchecked discretion in a judge to set the salaries for circuit court probation officers without providing grades or steps based on training, education, experience, or other facts. Again, the focus was that the statute in question did not specify facts or provide an outline of what the judicial officer was to consider in making his or her decision.

Turning to the specific statute in this case, the current version of the MEA provides that,

(a)(1) The sentence of death is to be carried out by intravenous lethal injection of one

(1) or more chemicals, as determined in kind and amount in the discretion of the Director of the Department of Correction.

(2) The chemical or chemicals injected may include one (1) or more of the following substances:

(A) One (1) or more ultra-short-acting barbiturates

(B) One (1) or more chemical paralytic agents;

(C) Potassium chloride; or

(D) Any other chemical or chemicals, including but not limited to saline solution.

(3) The condemned convict's death will be pronounced according to accepted standards of medical practice.

(4) The director shall determine in his or her discretion any and all policies and procedures to be applied in connection with carrying out the sentence of death, including but not limited to:

(A) Matters concerning logistics and personal correspondence concerning witnesses;

(B) Security;

(C) Injection preparations;

(D) Injection implementation; or

(E) Arrangements for disposition of the executed convict's body and personal property.

(5)(A) The policies and procedures for carrying out the sentence of death and any and all matters related to the policies and procedures for the sentence of death including but not limited to the director's determinations under this subsection are not subject to the Arkansas Administrative Procedure Act, § 25–15–201 et seq.

(B) The policies and procedures for carrying out the sentence of death and any and all matters related to the policies and procedures for the sentence of death are not subject to the Freedom of Information Act of 1967, § 25–19–101 et seq., except for the choice of chemical or chemicals that may be injected, including the quantity, method, and order of the administration of the chemical or chemicals.

(b)(1) If this section is held unconstitutional by an appellate court of competent jurisdiction, the sentence of death shall be carried out by electrocution in a manner determined by the director in his or her discretion.

(2) However, if the holding of the appellate court described in subdivision (b)(1) of this section is subsequently vacated, overturned, overruled, or reversed, the sentence of death shall be carried out by lethal injection as described in this section.

Ark.Code Ann. § 5–4–617 (Supp.2011).[3]

As written, subsection (a)(1) adopts "intravenous lethal injection of one (1) or more chemicals" as the method of punishment by death in Arkansas and leaves to the ADC the "kind and amount" of the chemicals to be used to effectuate lethal injection. Thus, subsection (a)(1) gives absolute discretion to the ADC to determine the chemicals to be used for lethal injection and gives no guidance regarding the selection of those chemicals. In subsection (a)(2), the statute provides a list of possible chemicals that may be used. However, that list is not mandatory. Rather, it articulates some chemicals that the director may, or may not, decide to use. The word "may" as employed implies

3. The current version of Ark.Code Ann. § 5–4–617, passed by Act 1296 of 2009, replaced the previous method-of execution statute, which read as follows:

(a)(1) The punishment of death is to be administered by a continuous intravenous injection of a lethal quantity of an ultra-short-acting barbiturate in combination with a chemical paralytic agent until the defendant's death is pronounced according to accepted standards of medical practice.

(2) The Director of the Department of Correction shall determine the substances to be uniformly administered and the procedures to be used in any execution.

(b) If the execution of the sentence of death as provided in subsection (a) of this section is held unconstitutional by an appellate court of competent jurisdiction, then the sentence of death shall be carried out by electrocution in a manner determined by the director.

(c) Nothing in this section shall be construed as a declaration by the General Assembly that death by electrocution constitutes cruel and unusual punishment in violation of the United States Constitution or the Arkansas Constitution.

Ark.Code Ann. § 5–4–617 (Repl.1997).

permissive or discretionary action or conduct and is construed in a permissive sense unless necessary to give effect to an intent to which it is used. *See Chrisco v. Sun Indus., Inc.,* 304 Ark. 227, 229, 800 S.W.2d 717, 718 (1990). Further, the list of chemicals is not exhaustive and includes, as an option, broad language that "any other chemical or chemicals" may be used.

Our prior cases interpreting statutes in conflict with the doctrine of separation of powers focus on whether a statute gives "absolute, unregulated, and undefined discretion" to a government agency and whether reasonable guidelines have been provided by which the administrative body is to exercise its discretionary power. The MEA plainly gives absolute and exclusive discretion to the ADC to determine what chemicals are to be used. Although subsection (a)(2) attempts to provide a list of chemicals for use in lethal injection, the ADC has unfettered discretion to use chemicals from that list or chemicals not included on that list. It can hardly be said that the word "may" used in conjunction with a list of chemicals that itself is unlimited provides reasonable guidance. Although the General Assembly can delegate to the ADC the power to determine certain facts or the happening of a certain contingency, the current MEA gives the ADC the power to decide all the facts and all the contingencies with no reasonable guidance given absent the generally permissive use of one or more chemicals. Moreover, subsection (a)(4) expressly gives complete discretion to the ADC to determine all policies and procedures to administer the sentence of death, including injection preparations and implementation. The statute provides no guidance and no general policy with regard to the procedures for the ADC to implement lethal injections.

The ADC argues that reasonable guidance can be found in the prohibition on cruel and unusual punishment in the Eighth Amendment and our state counterpart, Ark. Const. art. 2, § 9. In other words, the ADC maintains that because it is bound by the bar on cruel and unusual punishment, this prohibition acts as a supplement to the statutory language found in the MEA. This argument is misplaced. The ADC is correct that we presume that officials act with good faith and follow the law in carrying out their duties, such as implementing the mandate of the General Assembly for capital punishment by lethal injection. *See Cotten v. Fooks,* 346 Ark. 130, 55 S.W.3d 290 (2001). Nonetheless, the argument presented in this case is that the General Assembly has delegated its legislative authority by giving unfettered discretion, without sufficient guidelines for the use of that discretion, to another branch of government. The central question is thus whether the General Assembly has provided sufficient guidance. Where it has failed to do so, the doctrine of separation of powers has been violated and other constitutional provisions cannot provide a cure.

It is evident to this court that the legislature has abdicated its responsibility and passed to the executive branch, in this case the ADC, the unfettered discretion to determine all protocol and procedures, most notably the chemicals to be used, for a state execution. The MEA fails to provide reasonable guidelines for the selection of chemicals to be used during lethal injection and it fails to provide any general policy with regard to the lethal-injection procedure. Despite the fact that other states may analyze similar statutes differently according to their respective constitutions, we are bound only by our own constitution and our own precedent. Further, we note specifically that

nothing in this opinion shall be construed as implying what modifications to the statute would pass constitutional muster.

Although we agree with the circuit court's finding that the MEA is unconstitutional on its face, we must address the fact that the circuit court attempted to correct the constitutional issue by striking a portion of the language in subsection (a)(2)(D). On cross-appeal, the prisoners contend that the circuit court erred in striking a portion of the statute. The prisoners assert that the court's ruling striking some language made no operative change to the statute because it still grants complete discretion to the ADC in choosing the chemical or chemicals where subsection (a)(2) is but a list of permissive, not mandatory, chemicals that may, or may not, be used to effectuate lethal injection in the complete discretion of the ADC. Alternatively, they maintain that the MEA is not severable.

We agree with the prisoners that the circuit court's striking of specific language in subsection (a)(2)(D)—"[a]ny other chemical or chemicals, including but not limited to"—had no practical effect on the constitutionality of this statute. The ADC had the absolute discretion under subsection (a)(1) to determine the kind and amount of the chemicals to be injected. Moreover, as previously explained, subsection (a)(2) uses the term "may," which constitutes a permissive list in this situation. Therefore, the ADC was free to choose a chemical from that list or any other chemical, regardless of the language used in subsection (a)(2)(D). As such, striking the language in subsection (a)(2)(D) had no operative impact under these circumstances.

We also agree with the prisoners that the statute is not severable, and therefore, its constitutional infirmity cannot be removed. To determine whether the invalidity of part of an act is fatal to the entire legislation, we look to whether a single purpose is meant to be accomplished by the act, and whether the sections of the act are interrelated and dependent upon each other. *McGhee v. Ark. State Bd. of Collection Agencies,* 375 Ark. 52, 289 S.W.3d 18 (2008). The mere fact that an act contains a severability clause is to be considered, but is not alone determinative. *Id.*

First, in examining whether Act 1296 of 2009 contains a single purpose, we need look no further than the act itself. Its title states that it is "[a]n act to clarify the existing procedures for capital punishment by lethal injection; and for other purposes"; its subtitle is "[t]o clarify the existing procedures for capital punishment by lethal injection." This theme is repeated in the Act's emergency clause, which states:

SECTION 3. EMERGENCY CLAUSE. It is found and determined by the General Assembly of the State of Arkansas that the prompt administration of the death penalty following conviction of a capital offense is necessary to deter the future commission of capital offenses; and that this act is immediately necessary to deter capital offenses and prevent the loss of lives that result upon the commission of capital offenses. Therefore, an emergency is declared to exist and this act being immediately necessary for the preservation of the public peace, health, and safety shall become effective on:

(1) The date of its approval by the Governor.

(2) If the bill is neither approved nor vetoed by the Governor, the expiration of the period of time during which the Governor may veto the bill; or

(3) If the bill is vetoed by the Governor and the veto is overridden, the date the last house overrides the veto.

In our review of the first prong of the severability test, the clear purpose of Act 1296 is to provide the procedures, or methods, by which the State may execute a defendant who was convicted of a capital offense and sentenced to death by lethal injection.

Next, we determine whether sections of the MEA are "interrelated and dependent" upon each other. In doing so, this court has recognized the efficacy of severability clauses when part of an act is unconstitutional, but other provisions are valid, and we have had no difficulty in removing words or phrases, or even entire sections from statutes, when those provisions offended constitutional limitations upon legislative action. *Levy v. Albright*, 204 Ark. 657, 163 S.W.2d 529 (1942). If an act is constitutional in part, the valid portion will be sustained if complete in itself and capable of being executed in accordance with the apparent legislative intent. *Id.* at 659, 163 S.W.2d at 531. The constitutional and unconstitutional provisions may even be contained in the same section. *Id.* If a statute attempts to accomplish two or more objects, and is void as to one, it may still be in every respect complete and valid as to the other. *Id.* at 660, 163 S.W.2d at 531.

Here, the MEA as codified does not contain an express severability clause. While this factor alone is not determinative, it suggests that the legislative intent was to pass the act as a whole. More significantly, the statute as a whole appears to accomplish one objective-the clarification of the method of execution by lethal injection. Thus, we are loathe to affirm the circuit court's striking the language "[a]ny other chemical or chemicals, including but not limited to" leaving only the words, "saline solution," particularly when the striking of this language has no practical effect on the statute's unconstitutionality.

For these reasons, we declare the entirety of the MEA unconstitutional. Accordingly, we affirm the circuit court's ruling that the statute is unconstitutional and reverse its ruling striking specific language from subsection (a)(2)(D). We remand for entry of an order consistent with this opinion.

II. *Injunctive Relief*

For its second point on appeal, the ADC argues that this court should reverse the circuit court's issuance of an injunction restraining the State from obtaining sodium thiopental by any means that violates state or federal law. The circuit court entered this injunction after hearing evidence that the ADC had obtained seventy-five vials of "Thiopental Injection BP" from Dream Pharma, a vendor in the United Kingdom. The ADC maintains that this court should reverse the issuance of the injunction because all of the sodium thiopental that was obtained from Dream Pharma has been destroyed, rendering the issue moot; because the injunction is vague and over broad where it does not give specific detail as to what state and federal law with which the ADC must comply; and because the injunction applies into the indefinite future.

The prisoners maintain that the issue is not moot because claims seven and nine, which the injunction was based on, were not limited to the sodium thiopental manufactured and obtained from Dream Pharma but to the ADC's use of any sodium thiopental obtained in violation of state and federal law because without FDA approval, unregulated drugs may vary widely in identity, strength, quality, and purity. The prisoners contend that the injunction was necessary because the ADC's conduct with regard to obtaining sodium thiopen-

tal, which is scarce and largely unavailable in the United States, is capable of repetition but evasive for review purposes.

As a general rule, the appellate courts of this state will not review issues that are moot. *Delancy v. State*, 356 Ark. 259, 151 S.W.3d 301 (2004). To do so would be to render advisory opinions, which we will not do. *Id.* Generally, a case becomes moot when any judgment rendered would have no practical legal effect upon a then-existing legal controversy. *Id.* This court has recognized two exceptions to the mootness doctrine. *Id.* The first one involves issues that are capable of repetition, yet evade review, and the second one concerns issues that raise considerations of substantial public interest which, if addressed, would prevent future litigation. *Id.*

In the present case, the circuit court found that the ADC's second motion for summary judgment, which argued that claims seven and nine should be dismissed as moot, should be granted in all respects except that the ADC was enjoined from obtaining sodium thiopental in violation of state and federal law.

We agree with the circuit court's conclusion that the ADC's procurement of sodium thiopental from an unregulated vendor in the United Kingdom is moot; however, we reverse the grant of injunction. It is clear from our review of the record that claims seven and nine in the prisoners' supplemental complaint were limited to the sodium thiopental obtained from Dream Pharma (and not other illicitly obtained sodium thiopental). Particularly, in their supplemental complaint, the prisoners did not pray for an injunction to prevent the ADC from obtaining sodium thiopental in any illegal manner. Rather, they prayed for an injunction to prevent the ADC from using the sodium thiopental it obtained from Dream Pharma to execute the prisoners. Because all the sodium thiopental obtained from Dream Pharma has been destroyed and cannot again be obtained from that source,[4] these prisoners no longer run the risk of being executed with sodium thiopental obtained from Dream Pharma. Those claims, therefore, are moot. As such, injunctive relief was not proper, and we reverse and remand.

On cross-appeal, the prisoners urge this court to reverse the circuit court's grant of summary judgment as to the merits of claims seven and nine, which they characterize as constituting as-applied constitutional challenges to the lethal-injection procedures. As previously explained, our review of the prisoners' supplemental complaint reveals that claims seven and nine were specific to the sodium thiopental obtained from Dream Pharma. The circuit court found those claims moot because the sodium thiopental obtained from Dream Pharma had been destroyed and could not again be obtained from that source. Because we agree with the circuit court that those claims are moot, we need not address the merits of those claims.

Direct appeal affirmed in part and reversed and remanded in part; cross-appeal dismissed in part and reversed and remanded in part.

BAKER, J., and Special Justice BYRON FREELAND dissent.

CORBIN, J., not participating.

KAREN R. BAKER, Justice, dissenting.

The majority holds that granting discretion to the Director of the Department of Correction to administer the death pen-

---

4. The prisoners offered no proof to the contrary with regard to the destruction or subsequent procurement of sodium thiopental from Dream Pharma.

858

alty is a violation of the separation-of-powers provision of our constitution. With this holding, Arkansas becomes the only state to find such a violation. In addition, Arkansas is left no method of carrying out the death penalty in cases where it has been lawfully imposed. Because there is no basis for holding that the MEA violates our state constitution's separation-of-powers doctrine, I dissent.

Texas, which has a separation-of-powers provision that is identical to Arkansas's, has addressed a similar challenge to their statute. *See Ex parte Granviel,* 561 S.W.2d 503 (Tex.Crim.App.1978).[1] Granviel argued that the Texas lethal-injection statute constituted an improper delegation of legislative power to the director of the Texas Department of Corrections in violation of the state constitution. The court noted that while the legislature generally cannot commit its legislative powers to another agency, the legislature does possess many powers that it may exercise either directly or indirectly through the agency of another body. *Id.* The court observed that the line between a "proper grant of authority to perform acts not strictly legislative" and an unlawful delegation is difficult to define. *Id.* at 514. Where a legislative body has declared a policy and fixed a primary standard, it may generally delegate the authority to establish rules, regulations, or minimum standards that are reasonably necessary to execute the expressed purpose of the act. *Id.* The court stated that "[s]o long as the statute is sufficiently complete to accomplish the regulation of the particular

matters falling within the Legislature's jurisdiction, the matters of detail that are reasonably necessary for the ultimate application, operation and enforcement of the law may be expressly delegated to the authority charged with the administration of the statute." *Id.* The delegation of authority for an administrative officer to exercise discretion does not cause a statute to be unconstitutional where there are standards for guidance, although the guidance may be general, that are capable of being reasonably applied. *Id.* The legislature exercised its constitutional power to enact a law that states that the penalty for capital murder shall be death or life imprisonment. *Id.* The legislature then amended the statute to provide that lethal injection "by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death" shall be the mode of execution. *Id.* at 515. The legislature stated that the director of the department of corrections was to determine the procedure to be used in carrying out the execution. *Id.* The court concluded that the legislature "declared a policy and fixed a primary standard and delegated to the said Director power to determine details to carry out the legislative purpose which the Legislature cannot practically or efficiently perform itself." *Id.*

Delaware has likewise concluded that its lethal-injection statute, granting the commissioner of the Department of Corrections discretion in carrying out the manner of the execution. *State v. Deputy,* 644 A.2d 411 (Del.Super.1994), aff'd 648 A.2d 423 (Del.1994).[2] In *Deputy,* the court stated that "[n]o requirement exists that

1. The Texas statute that the prisoner challenged in *Granviel* provided as follows: Whenever the sentence of death is pronounced against a convict, the sentence shall be executed at any time before the hour of sunrise on the day set for the execution not less than thirty days from the day of sentence, as the court may adjudge, by intravenous in-

jection of a substance or substances in a lethal quantity sufficient to cause death and until such convict is dead, *such execution procedure to be determined and supervised by the Director of the Department of Corrections.*

2. At the time of Deputy's appeal, the Delaware statute on lethal injection read in pertinent part as follows: "Punishment of death

the state statute itself must establish detailed procedures for the administration of the death penalty." *Id.* at 420. The court upheld the statute against a challenge that leaving the procedures to the discretion of the Commissioner constituted an unlawful delegation of legislative authority.

Idaho has also found that its statute giving the director of the Department of Corrections discretion in carrying out the death penalty by lethal injection passed constitutional muster under a challenge based on an unauthorized grant of legislative authority. *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981).[3] The supreme court in *Osborn* relied heavily on *Granviel* in reaching its conclusion:

> [T]he existence of an area for exercise of discretion by an administrative officer under $\lfloor_{25}$delegation of authority does not render delegation unlawful where standards formulated for guidance and limited discretion, though general, are capable of reasonable application[.]
>
> . . . .
>
> It appears that the Legislature has declared a policy and fixed a primary standard and delegated to the said Director power to determine details so as to carry out the legislative purpose which the Legislature cannot practically or efficiently perform itself. The statute is sufficiently complete to accomplish the regulation of the particular matters falling within the Legislature's jurisdiction.

shall, in all cases, be inflicted by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until such person sentenced to death is dead, *and such execution procedure shall be determined and supervised by the Commissioner of the Department of Correction."* *Deputy,* 644 A.2d at 417 (emphasis supplied) (quoting Del. Code Ann. tit. 11, § 4209(f)).

3. The statute in Idaho at the time of *Osborn,* Idaho Code Ann. § 19–2716, read as follows: The punishment of death must be inflicted by the intravenous injection of a substance

*Osborn,* 631 P.2d at 201 (quoting *Granviel,* 561 S.W.2d at 514–15).

The Florida Supreme Court has also upheld its lethal-injection statute in the face of a separation-of-powers argument.[4] *Diaz v. State,* 945 So.2d 1136 (Fla.2006). The court reached its conclusion after noting that it traditionally had applied a "strict separation of powers doctrine" that included a prohibition on the legislature's ability to delegate "the power to enact a law or the right to exercise unrestricted discretion in applying the law." *Id.* (quoting *Sims v. State,* 754 So.2d 657, 668 (Fla. 2000)). The court observed that

> the Legislature may "enact a law, complete in itself, designed to accomplish a general public purpose, and may expressly authorize designated officials within definite valid limitations to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose."

*Id.* at 1143 (quoting *Sims,* 754 So.2d at 668 (quoting *State v. Atlantic Coast Line R.R. Co.,* 56 Fla. 617, 47 So. 969, 976 (1908)). The court quoted from Sims, where it gave four reasons for not finding Florida's lethal-injection statute an unlawful delegation of legislative authority:

> First, the statute clearly defines the punishment to be imposed (i.e., death). Thus, the $\lfloor_{26}$DOC is not given any discretion to define the elements of the crime

or substances in a lethal quantity sufficient to cause death until the defendant is dead. The director of the department of corrections shall determine the substance or substances to be used and the procedures to be used in any execution.
*Osborn,* 631 P.2d at 201.

4. Florida's lethal-injection procedure calls for the use of "the drug or drugs necessary to compound a lethal injection." Fla. Stat. Ann. § 922.105.

or the penalty to be imposed. Second, the statute makes clear that the legislative purpose is to impose death. [The Secretary of the Department of Corrections] testified that the purpose of the DOC's execution day procedures were to achieve the legislative purpose "with humane dignity." Third, determining the methodology and the chemicals to be used are matters best left to the Department of Corrections to determine because it has personnel better qualified to make such determinations. Finally, we note that the law in effect prior to the recent amendments stated simply that the death penalty shall be executed by electrocution without stating the precise means, manner or amount of voltage to be applied.

*Id.* at 1143 (quoting *Sims,* 754 So.2d at 670). In *Sims,* the court observed "that most of the states employing lethal injection leave the task of implementing procedures for administering lethal injection to an administrative agency." *Sims,* 754 So.2d at 669.

In addition to the foregoing, a multitude of other states provide general guidance in the form of granting discretion to the director of the department of corrections to administer a substance or substances in a quantity sufficient to cause death. *See, e.g.,* Ohio Rev.Code Ann. § 2949.22; Ky. Rev.Stat. Ann. § 431.220 (upheld in *Baze v. Rees,* 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008)); Kan. Stat. Ann. § 22–4001; Va.Code Ann. § 53.1–233; 22 Okla. Stat. Tit. 22, § 1014; Ga.Code Ann. § 17–10–38; Ind.Code § 35–38–6–1; La. Rev.Stat. Ann § 15:569; Nev.Rev.Stat. § 176.355.

I disagree that *Venhaus v. State ex rel. Lofton,* 285 Ark. 23, 684 S.W.2d 252 (1985), *State v. Bruton,* 246 Ark. 293, 437 S.W.2d 795 (1969), and *Walden v. Hart,* 243 Ark. 650, 420 S.W.2d 868 (1967), compel a conclusion that the grant of discretion to the Director in the MEA violates our separation-of-powers doctrine. Unlike *Venhaus, Walden,* and *Bruton,* where the statutes at issue contained no guidance to assist with the delegation, the General Assembly has provided a general framework in the MEA within which the Director must exercise his discretion in carrying out capital punishment. The legislature determined that Arkansas's method of capital punishment is death by lethal injection, stating that the "sentence of death is to be carried out by intravenous lethal injection of one (1) or more chemicals[.]" Ark.Code Ann. § 5–4–617(a)(1). The Director is given discretion in carrying out the lethal injection, with some guidance: the chemical(s) injected may include one or more of the substances set forth in subsection (a)(2), which is a list of the three chemicals commonly used in this country to implement death by lethal injection. Thus, the legislature provided a general framework in stating that the death penalty shall be carried out by lethal injection, that the injection shall be intravenous, and by listing chemicals that may be used in the injection. In *Venhaus,* we acknowledged that once the legislature sets out the law, it can delegate the authority or discretion to carry out the law. *Venhaus,* 285 Ark. at 28, 684 S.W.2d at 255. We stated that such a delegation is useful where the execution of the law "must be a subject of inquiry and determination outside the halls of legislation." *Id; see also Bakalekos v. Furlow,* 2011 Ark. 505, 385 S.W.3d 810 (noting that discretionary power may be delegated by the legislature to a state agency as long as reasonable guidelines are provided). In *Bruton,* we held that the statute gave the State Penitentiary Board the authority *to enact a penal statute,* which is far different than the discretion that the MEA gives the Director to carry out a punishment, death, that the legislature has set forth in the manner that the legislature has set forth, by lethal injection. *See Bruton, supra.*

Here, the legislative delegation contained in the MEA is not the delegation of the authority to make the law, but rather is the delegation of the authority and discretion to carry out the law. The execution of this law is precisely the type of delegation of "details with which it is impracticable for the legislature to deal directly." *Leathers v. Gulf Rice Ark., Inc.*, 338 Ark. 425, 429, 994 S.W.2d 481, 483 (1999) (quoting *Currin v. Wallace*, 306 U.S. 1, 15, 59 S.Ct. 379, 83 L.Ed. 441 (1939)). The standards for applying the method of execution, although general, are capable of being reasonably applied where the General Assembly has (1) clearly defined the punishment, death by lethal injection; (2) made clear that the statute's purpose is to impose death; and (3) the methodology and chemicals are best left to the discretion of the Director because the ADC personnel are better qualified to make such determinations and the methodology and chemicals are details with which it is impracticable for the legislature to deal directly. *See Diaz, supra; see also Gulf Rice, supra.* Also, as in *Diaz*, the prior law in Arkansas provided that the death penalty shall be administered by electrocution without any description of the method or manner of carrying it out. *See Diaz, supra.*

The majority, in contrast, does not allow for the legislature to grant the Director any discretion at all in determining the chemicals or procedures used in carrying out the lethal-injection procedure. They find the MEA constitutionally flawed because the guidance found in subsection (a)(2) is "not mandatory." However, a guideline is a recommended practice that allows discretion in its implementation rather than a "mandatory" directive. Guidance does not require a dictation of all terms, and such a construction is antithetical to our case law. *See, e.g., Hollo-*

*way v. Ark. State Bd. of Architects*, 352 Ark. 427, 101 S.W.3d 805 (2003) (clearly rejecting the argument that a statute must spell out all details, leaving no discretion vested with the administrative body). While the current MEA does not give mandatory directives to the Director as to the chemicals and procedure used in carrying out lethal injection, it does provide guidance.

Further, appellants' discretion is not "unfettered" because they are at all times bound by the constraints of our federal and state constitutions against cruel and unusual punishment. We have noted that the failure of a statute to incorporate the terms of the constitution does not render the statute constitutionally deficient. *Herman v. State*, 256 Ark. 840, 512 S.W.2d 923 (1974). In other words, it is not necessary to write the constitution into every legislative act. In addition, the Eighth Circuit Court of Appeals has specifically determined that Arkansas's lethal-injection protocol does not violate the Eighth Amendment prohibition against cruel and unusual punishment in a case brought by one of the appellees. *Nooner v. Norris*, 594 F.3d 592 (8th Cir.2010), cert. denied, —— U.S. ——, 131 S.Ct. 569, —— L.Ed.2d —— (2010). In reviewing the protocol, the court noted that Arkansas uses the same three-drug protocol that at least thirty other states use, which had been developed "to cause as little pain as possible." *Id.* at 601 (citing *Baze v. Rees*, 552 U.S. 945, 128 S.Ct. 372, 169 L.Ed.2d 256 (2007)).

Based on the foregoing, I would reverse the circuit court's finding that the MEA is unconstitutional.

Special Justice BYRON FREELAND joins.